## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ALCUS SMITH**                                              **CIVIL ACTION**

**v.**                                                       **NO. 20-3190**

**STATE OF LOUISIANA**                                       **SECTION: "L"(1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

### I.  State Court Factual and Procedural Background

Petitioner, Alcus Smith, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  On February 26, 2015, Smith was charged by a bill of indictment with racketeering in violation of La. Rev. Stat. § 15:1352 (count one), conspiracy to distribute cocaine in violation of La. Rev. Stat. §§ 40:979 and 40:967(A) (count two), the second degree murder of Donte Hall in violation of La. Rev. Stat. § 14:30.1 (count seventeen), and possession with intent to distribute cocaine in violation of La. Rev. Stat. § 40:697(A) (count nineteen).[1]  After a joint trial

---

[1] State Rec., Vol. 1 of 17 , Bill of Indictment dated February 26, 2015.  Twenty other co-defendants were also charged in the 30-count indictment for various acts of racketeering committed in furtherance of a narcotics distribution network on the West Bank of Jefferson Parish operated by a street gang known by its members as the "Harvey Hustlers.".

with co-defendant Robert Williams, a jury found Smith guilty as charged as to counts one, two and nineteen.[2]  The jury was unable to reach a verdict as to count seventeen.[3]  The trial court denied Smith's motion for new trial on November 18, 2015.[4]  On that same date, the trial court sentenced Smith to 50 years imprisonment at hard labor as to count one, 15 years imprisonment at hard labor as to count two, and 30 years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for the first two years of the sentence as to count 19, each sentence to run concurrently.[5]

The state filed a multiple offender bill.[6]  On December 17, 2015, the trial court found Smith to be a second felony offender, vacated his sentence as to count one, and resentenced him as a second felony offender to 65 imprisonment at hard labor without the benefit of probation or suspension of sentence and to run concurrently with any other sentences he was already serving.[7]

---

[2] State Rec., Vol. 2 of 17, minute entry dated October 27, 2015; minute entry dated October 28, 2015; minute entry dated October 29, 2015; minute entry dated October 30, 2015; minute entry dated November 2, 2015; minute entry dated November 3, 2015; minute entry dated November 4, 2015; minute entry dated November 5, 2015; minute entry dated November 6, 2015; verdict, 11/6/15; State Rec., Vol. 6 of 17, trial transcript of October 29, 2015; trial transcript of October 30, 2015; State Rec., Vol. 7 of 17, trial transcript (con't) of October 30, 2015; trial transcript of November 2, 2015; State Rec., Vol. 8 of 17, trial transcript (con't) of November 2, 2015; trial transcript of November 3, 2015; State Rec., Vol. 9 of 17, trial transcript (con't) of November 3, 2015; trial transcript of November 4, 2015; State Rec. Vol. 10 of 17, trial transcript (con't) of November 4, 2015; trial transcript of November 5, 2015; State Rec. Vol. 11 of 17, trial transcript (con't) of November 5, 2015; trial transcript of November 6, 2015; State Rec. Vol. 12 of 17, voir dire transcript of October 27, 2015; State Rec. Vol. 13 of 17, voir dire transcript (con't) of October 27, 2015; State Rec. Vol. 14 of 17, voir dire transcript (con't) of October 27, 2015; State Rec. Vol. 14 of 17, voir dire transcript of October 28, 2015; Vol. 15 of 17, voir dire transcript (con't) of October 28, 2015.

[3] State Rec., Vol. 2 of 17, verdict, 11/6/15.  The state later dismissed count seventeen and filed a superseding bill of indictment.  State Rec., Vol. 2 of 14, minute entry dated April 25, 2016; minute entry dated May 4, 2016.  After a second trial, Smith was convicted of second degree murder of Donte Hall and sentenced to life imprisonment to be served concurrently with his sentences in this case.  State v. Smith, 325 So. 3d 509 (La. App. 5th Cir. 2021), writ denied, State v. Smith, 327 So. 3d 992 (La. 2021).

[4] State Rec., Vol. 2 of 17, minute entry dated November 18, 2015; Motion for New Trial filed November 17, 2015; State Rec., Vol. 11 of 17, sentencing transcript of November 18, 2015.

[5] State Rec., Vol. 2 of 17, minute entry dated November 18, 2015; Commitment Order dated November 18, 2015; State Rec., Vol. 11 of 17, sentencing transcript of November 18, 2015.

[6] State Rec., Vol. 2 of 17, multiple bill filed November 30, 2015.

[7] State Rec., Vol. 12 of 17, multiple bill hearing and resentencing transcript of December 17, 2015.

On August 30, 2017, the Louisiana Fifth Circuit Court of Appeal affirmed Smith's convictions and sentences but remanded the case for correction of the uniform commitment order.[8] Smith filed a writ application with the Louisiana Supreme Court which denied relief on September 14, 2018.[9]

Smith filed an application for post-conviction relief on September 17, 2019.[10]  On December 2, 2019, the state district court denied relief.[11]  Smith's related writ application to the Louisiana Fifth Circuit was denied on March 2, 2020.[12]  The Louisiana Supreme Court denied his related writ application on November 17, 2021.[13]

In the interim, on November 23, 2020, Smith filed the instant federal application seeking habeas corpus relief in which he asserts the following claims for relief[14]: (1) insufficient evidence supported his conviction as to count 19; (2) the state trial court erred in denying his motion to suppress; (3) the state trial court erred in failing to grant a mistrial when improper contact was had between a juror and the prosecutor; (4) his 65-year sentence as to count one is excessive; (5) ineffective assistance of counsel for failing to move for a severance from co-defendant Williams; and (6) Louisiana's use of nonunanimous verdicts at his trial in 2015 was unconstitutional.

On June 16, 2021, the state filed its response.[15]  The state concedes that Smith's application is timely and that four of his claims are exhausted.  The state contends that Smith failed to exhaust claims four and six and that those claims are technically procedurally barred.  The state further contends that Smith's claims are meritless.

---

[8] State v. Smith, 227 So.3d 337 (La. App. 5th Cir. 2017); State Rec., Vol. 12 of 17.
[9] State v. Smith, 252 So. 3d 481 (La. 2018); State v. Smith, 252 So. 3d 482 (La. 2018); State Rec., Vol. 17 of 17.
[10] State Rec., Vol. 4 of 17, Uniform Application for Post-Conviction Relief dated September 17, 2019.
[11] State Rec., Vol. 4 of 17, Order on Post-Conviction Application of December 2, 2019.
[12] State Rec., Vol. 16 of 17, La. 5th Cir. Order, 20-KH-36, dated March 2, 2020; 5th Cir. Writ Application, 20-KH-36, dated December 30, 2019.
[13] State v. Smith, 327 So.3d 992 (La. 2021); State Rec., Vol. 17 of 17.
[14] Rec. Doc. 1.
[15] Rec. Doc. 15.

### I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1705 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court

precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

　　　　While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> 　　　If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts— from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

　　　　The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein.  White, 134 S. Ct. at 1701.

## II. Facts

On direct appeal, the Louisiana Fifth Circuit summarized the facts of this case as follows[16]:

At trial, evidence was presented that this case arises from a federal investigation conducted by a task force identified as the Federal Bureau of Investigation (FBI) New Orleans Gang Task Force, comprised of federal and state officers, into drug trafficking in Jefferson Parish. Through the investigation, law enforcement learned that a narcotics distribution network was being operated on the West Bank of Jefferson Parish by a violent street gang known as the "Harvey Hustlers." It was discovered that members of this narcotics organization would obtain controlled dangerous substances transported into the New Orleans area from known source locations, including the State of Texas, from fellow gang members and other associates. The acquired narcotics were then converted into saleable form and provided to street level dealers working for the Harvey Hustlers, who in turn would sell the product for the profit of the gang's members.

According to the testimony established at trial, while operating their narcotics network, the members of the Harvey Hustlers and their known associates committed various drug offenses and other criminal acts including, but not limited to, murder, solicitation to commit murder, obstruction of justice, and illegal possession of firearms. Witness testimony confirmed that co-defendant, Robert Williams aka "Lil Rob," held a leadership role in the Harvey Hustlers and as such, directed the illegal activities of other gang members, while Defendant, Alcus Smith aka "Bug," participated in the transportation and distribution of wholesale amounts of powder cocaine to Harvey Hustler members. Information regarding the inner workings of this criminal enterprise were further obtained from numerous wiretaps secured on cellular telephones belonging to co-defendant Williams, Defendant, and other members and/or associates of the Harvey Hustlers.

As a result of the multi-agency investigation, which spanned several years, 21 defendants were indicted in both federal and state courts and charged with over 50 acts of racketeering and 30 additional criminal offenses.

The specific facts adduced at trial surrounding the offenses for which Defendant and co-defendant Williams have been charged are as follows.

### The drug trafficking investigation

FBI Special Agent Todd Schliem testified regarding the multi-agency investigation spanning the course of years of the Harvey Hustlers, recognized for extreme acts of violence associated with drug distribution in Jefferson Parish. According to Special Agent Schliem, the members of the Harvey Hustlers and their known associates totaled over 100 and their purpose was to make money through the sale of narcotics. He explained that in 2005—in the time period following

---

[16] Smith, 227 So.3d at 339-350; State Rec., Vol. 12 of 17.

Hurricane Katrina—there was a limited supply of narcotics available in Jefferson Parish, with one exception.  In the Scottsdale neighborhood on the West Bank of Jefferson Parish, the Harvey Hustlers were able to establish and/or maintain a significant drug supply, thereby creating high demand for their product.  Special Agent Schliem noted that from that time forward, the Harvey Hustlers exerted influence in Scottsdale and other neighborhoods in Jefferson Parish, establishing a hierarchy inside their gang.

Co-defendant's brother, David Williams aka "Mr. Harvey," was identified as the leader of the Harvey Hustlers until his murder in 2010.  It was discovered that during the time period when the Harvey Hustlers were experiencing very profitable drug sales, there was an internal strain amongst the gang members vying for leadership positions.  A "civil war" broke out, dividing the group into those who supported David Williams and those who supported brothers Melvin and Jermaine Hudson.  Special Agent Schliem described the events leading up to David Williams' murder as a "domino effect" beginning with the murder of Chad Jones, a close associate of David Williams.  He explained that when David Williams discovered that a fellow gang member by the name of Laval London had participated in Jones' murder, David Williams had London killed in retaliation.  Consequently, in retaliation for the murder of London—who was a close associate of the Hudson brothers—David Williams was killed.[3]  During this turmoil, the Harvey Hustlers separated into subgroups based on their identified loyalties.  Those loyal to the Hudson brothers grouped into subsets of the gang identified as the "Murder Squad" and the "Young, Black and Successful" (YBS), while those loyal to David Williams and his brother, co-defendant Williams, identified as "HH."

[3] Criminal charges had not been brought in relation to these murders; however, several suspects were developed, including the Hudson brothers and Paul Smith.

Based on the investigation into the members of the Harvey Hustlers, approximately ten federal and state court indictments were obtained resulting in over 20 convictions.  At the time the state and federal indictments were returned, co-defendant Williams was recognized as one of the leaders of the Harvey Hustlers.

Several investigative techniques were employed while conducting the investigation into the Harvey Hustlers, including basic surveillance, analysis of phone records, witness interviews, use of confidential informants, controlled narcotics purchases, and wiretaps.  Among the relevant wiretaps were those placed on the cellular telephones of co-defendant Williams, co-defendant Williams' brother, Clifford Sonnier, and Nathan Carter beginning in October of 2013.  Special Agent Schliem identified for the jury numerous intercepted phone calls purported to capture the voices of co-defendant Williams and/or Sonnier and their alleged associates.  Specifically, testimony was elicited regarding a November 6, 2013 intercept wherein co-defendant Williams received a phone call from an unidentified female who alerted him that the police had been by his residence at 1104 Clydesbank and reminded him that he "put his mojo [synthetic marijuana] in there."  Co-defendant Williams then replied, "[y]ep and my hammer," which Special Agent Schliem explained is street vernacular for a firearm.  Special Agent Schliem noted

that the referenced firearm was stolen and had been seized from the residence by Detective John Wiebelt.

Detective Wiebelt of the Jefferson Parish Sheriff's Office (JPSO) confirmed that on November 6, 2013, he assisted in an eviction at 1104 Clydesbank. The home was unoccupied, and inside, officers seized a firearm and a black bag containing synthetic marijuana (also known as "mojo" or "gas") and a digital scale. It was discovered that the firearm seized had been stolen.[4]

[4] Steven Collins testified that in 2012 he owned a firearm that was stolen from the glove compartment of his vehicle. He stated that he reported the gun stolen and provided the police with its serial number. Mr. Collins further indicated that co-defendant Williams did not have his permission to take or possess his firearm at any time.

Special Agent Schliem also identified various phone calls and text messages exchanged between members of the gang and their known associates including Defendant and Sonnier, leading up to a meeting to conduct a drug transaction at a daiquiri shop in Harvey, Louisiana, on November 18, 2013.

The relevant intercepted communications began with a text message sent by Sonnier to Carter at 2:55 p.m., in which Sonnier texted Carter: "Sup Big Homie." At 3:10 p.m., Carter responded, "I'm 'bout to call him." Carter then sent another text message to Sonnier that said: "he 'bout to call you from a 758 num." Special Agent Schliem noted that "758" is the first three digits of the phone number used by Defendant. A phone call was then made at 3:17 p.m., by Defendant wherein he told Sonnier, "Nathan gave me your number" and Sonnier told Defendant, "give me three of them," prompting Defendant to respond, "like last time."[5] Two subsequent conversations between Sonnier and an unidentified female reflect Sonnier's effort to obtain "about $1500." Then, at 5:29 p.m. Defendant texted Sonnier, "I'm ready when you ready." Sonnier then texted Defendant at 5:55 p.m. inquiring as to his whereabouts, to which Defendant responded, "I'm on Ames." Sonnier informed Defendant that he was at the daiquiri shop, and Defendant replied, "K. On my way." Meanwhile, a phone call was also intercepted between Sonnier and Willie Thornton during which Sonnier told Thornton that he wanted him to "work his magic for me"[6] and that he will pick him up. At 6:17 p.m., Sonnier asked Defendant where he was and advised him that he was turning on Manhattan Boulevard at Lapalco, to which Defendant informed Sonnier that he was "about to pull up there."

[5] Smith's statement "like last time," references an earlier November 8, 2013 wiretap conversation between Sonnier and Carter regarding a meeting in front of the "Dale," which Special Agent Schliem believed to be a reference to the Scottsdale neighborhood.

[6] Based upon his investigation, Special Agent Schliem believed "work your magic" to mean "someone that would take powder cocaine and cook it in the—in a cocaine base, or crack cocaine."

FBI Agent Lon Boudreaux testified that he participated in the wiretap surveillance of the phones belonging to co-defendant Williams and Sonnier on November 18, 2013. Based on the content of the phone calls, officers monitored the movements of Sonnier's Mazda. During the course of the surveillance, Agent

Boudreaux testified that he observed activity consistent with narcotics trafficking. Agent Boudreaux testified that at one point, he followed the Mazda to a daiquiri shop at Lapalco and Ames Boulevard where a meeting took place. At the daiquiri shop, Agent Boudreaux observed a red Malibu pull-up alongside the Mazda and throw an object into the Mazda. Finding this activity suspicious, officers followed the red Malibu before receiving a phone call from Special Agent Schliem regarding a second meeting and delivery of narcotics that was scheduled to occur at another daiquiri shop on Manhattan Boulevard.

Upon arrival, Agent Boudreaux observed the Mazda pull into the parking lot and noticed Sonnier standing outside talking to Thornton.[7] A few minutes later, co-defendant Williams walked out of the daiquiri shop, and a Nissan sports car pulled in and parked across from Sonnier's vehicle. Defendant exited from the driver's side of the Nissan.[8] According to Agent Boudreaux, Defendant approached Sonnier and spoke to him.[9] Defendant then escorted Thornton back to his vehicle where two other unidentified individuals exited the Nissan and served as "lookouts," while Thornton and Defendant got into the car. Approximately one minute later, Thornton exited the Nissan and went back to where co-defendant Williams and Sonnier were standing. After a time, co-defendant Williams, Thornton, Sonnier, and an unidentified female entered the Mazda with Brandon Motton behind the wheel. The vehicle then departed followed by intercepting undercover police units. A high-speed chase ensued during which a text message was intercepted between Sonnier and Defendant that read, "you serious fool?" After the chase, Agent Boudreaux indicated that Thornton and Motton were apprehended, but the remainder of the occupants in the vehicle evaded officers on foot.

[7] Agent Boudreaux testified that he was able to identify Sonnier and co-defendant Williams from prior surveillances where he had observed the pair at various meeting locations engaging in activity consistent with narcotics trafficking.

[8] Agent Boudreaux testified that co-defendant Williams was dressed in all red, and is "quite short," so he was "very observable when he walked up to the rest of the group."

[9] Co-defendant Williams was standing a few feet away and within hearing distance of their conversation.

On cross-examination, Agent Boudreaux testified that on a couple of previous occasions, he had seen co-defendant Williams and Sonnier "drive around all night stopping at one location and the next," and that based on the wiretaps, it was concluded that they were participating in drug transactions.

The high-speed chase was explained in greater detail by Detective Anthony Buttone of the JPSO, who testified that on November 18, 2013, at approximately 6:30 p.m., he participated in a joint investigation with the FBI in which a mobile surveillance of a daiquiri shop, on Manhattan Boulevard and the West Bank Expressway, was conducted. Pursuant to the surveillance, Detective Buttone, along with Agent Mike Tucker and Lieutenant Kevin Decker—each in separate unmarked police units—followed a silver Mazda as it exited the parking lot of the daiquiri shop. After having observed several traffic infractions, Detective Buttone elected to conduct a traffic stop. Detective Buttone testified that the Mazda stopped briefly

before it sped off.  A high-speed chase ensued, and sight of the vehicle was lost for a brief period of time.  The Mazda was ultimately discovered in a driveway at 917 Drake Avenue, where it had been abandoned.  Inside the vehicle, the officers seized two plastic bags containing what appeared to be marijuana,[10] sandwich bags containing a razor blade, a digital scale, and crack cocaine.[11]  The driver, Brandon Motton, and a passenger, Willie Thornton, were found hiding nearby and were taken into custody.

[10] Chemical testing revealed that the substance was synthetic marijuana.

[11] Pamela Williams–Cyprian of the JPSO Crime Laboratory testified as an expert in the identification and analysis of controlled dangerous substances.  She testified that the contraband found inside the Mazda and along the route driven by the Mazda tested positive for cocaine, and State's Exhibit 29 tested positive for a synthetic cannabinoid called AB–Fubinaca aka "mojo."  She further testified that State's Exhibit 28 contained two different types of "mojo" (AB–Pinaca and AB–Fubinaca).

Detective William Roniger of the JPSO also participated in the high speed chase and arrests of Motton[12] and Thornton.  On the evening of their apprehension, Detective Roniger testified that his role was to monitor the telephone wiretap surveillance of cellular phones registered to co-defendant Williams and Sonnier and to participate in the mobile surveillance of the Mazda.  Detective Roniger testified that during the chase, information was gleaned from communications on the wiretap that provided some indication of the actions of the individuals inside the Mazda.  This information included the whereabouts of co-defendant Williams and Sonnier in the immediate aftermath of the chase, as well as information regarding objects that may have been thrown from the Mazda during the chase.

[12] Motton was in possession of the key to the Mazda at the time of his arrest.

Accordingly, a search of the route taken by the Mazda during the chase was conducted resulting in the recovery of various photographs, 128 grams of cocaine, four grams of crack cocaine, and a Glock firearm—later learned to have been reported stolen.  Detective Roniger further testified on cross-examination that based on co-defendant Williams' own admission heard on the wire intercepts, he believed co-defendant Williams was the only person inside the Mazda to have possessed the firearm that was recovered.[13]  Detective Roniger also testified regarding several "controlled buys" he oversaw between his confidential informant and members of the Harvey Hustlers including Thornton, Keitrel Gumms, Richard Chess, Carnell Pierce, and Corey Trent.[14]

[13] Donna Quintanilla of the JPSO Crime Laboratory testified as an expert in latent fingerprint comparison and analysis.  Ms. Quintanilla told the jury that she matched co-defendant Williams' fingerprints to those affixed to certified court records for a 2001 conviction for simple burglary and a 2006 conviction for possession of a firearm by a convicted felon.

[14] The confidential informant was identified as Nicole Newton.  Her identity was revealed because she was suffering from terminal cancer.  Marcel Folse of the JPSO Crime Laboratory testified as an expert in the analysis and identification of controlled dangerous substances.  Folse testified the narcotics used in the undercover buys tested positive for cocaine.

Special Agent Schliem was recalled and testified that prior to the meeting at the daiquiri shop in November of 2013, communications were intercepted demonstrating Sonnier's intent to acquire narcotics.  He further indicated that after

the meeting at the daiquiri shop and during the high-speed chase between the officers and the Mazda, a text message was sent between Sonnier and Defendant. The text message read, "U serious fool?"  Later that evening, Sonnier then sent a text message to an unknown person writing, "[m]an, dis sum crazy s**t.  I think n***er jus try to set me up.  I jus went spent 5,000 wit him.  We met on Manhattan. By time I made it to Ames I was getting pull o."  Agent Schliem noted that $5,000 would be enough money to purchase the 4.5 ounces of cocaine discarded from the Mazda and seized from the side of the road following the chase.  Another text message, also sent by Sonnier that same evening, to another unidentified individual stated, "[m]an, my f**king lil world so crazy, bruh.  I jus got n a high-speed chase bout a hour ago.  Took a lost for 5 racks.[15]  Well, I hope its not a lost.  I gotta go find it.  I think n***er tried 2 set me up.  I knew I shouldve brought u dat money. My nerves so bad. Got the car towed & all."

[15] Special Agent Schliem testified that the term "racks" is a word used in the "drug world for increment[s] of $1,000."

The day after the chase, November 19, 2013, a text message from Sonnier to Nathan Carter—an associate/business partner of Defendant—was intercepted. In the text message, Sonnier wrote to Carter, "[c]an you meet me sumwea big son i need to holla at u str8up," to which Carter replied, "[b]e down there this weekend." Approximately four minutes later, Sonnier responded to Carter, "Son, bull[16] told u wat happen?" to which Carter replied "Yea."  Next, Sonnier then texts, "Big son, that was all I had son, nolie && dey towed my gurl s.  I'm n dis lil rat motel wit nut10.  Feel me.  Cnt go hme.  Scared dey gon cum dea.  I need u tho so," to which Carter responded, "Ima hit u when I come down," prompting Sonnier to reply, "Imma just lay low till u cum thru son dis s mad crazy."

[16] Special Agent Schliem testified that "Bull" is Defendant's nickname.

In addition to these text message communications, Special Agent Schliem testified that telephone calls were also intercepted following the chase.  In these communications, co-defendant Williams was heard admitting to his participation in the event, as well as to his possession of a firearm, aka a "hammer," and to having pointed the firearm at Motton in order to compel him to evade the police. Specifically, co-defendant Williams was heard talking about Sonnier's vehicle, the Mazda that was searched by the police, saying, "[t]hey ain't nothing in there, though.  They ain't got nothing in it, but we got beaucoup pictures and s**t int here."  In the pictures referenced by co-defendant Williams, various members of the Harvey Hustlers, including co-defendant Williams, Sonnier, Motton, Tavaris Arbuthnot aka "T-row," Ray Woodruff, Isaac Smith, Frankie Hoofkin, Walter Wright, Kerry Reynard, Richard Chess, Keitrel Gumms, Cornell Harris, and Kevin Simmons, are depicted.  Some of the gang members are seen wearing chains with the letters "HH"[17] for Harvey Hustlers or "SD" for Scottsdale.  In another phone call, Sonnier was heard explaining to co-defendant Williams that when he went back to search for the gun and/or drugs that were thrown from the Mazda during the chase, the Westwego Police Department pulled him over and issued him a traffic citation and then let him go.

[17] Co-defendant Williams is depicted wearing a chain with the letters "HH" around his neck.

Willie Thornton testified under legal compulsion, pursuant to Louisiana Code of Criminal Procedure Article 439.1.  Thornton testified regarding his three prior felony convictions and his pending criminal offenses charged in the same indictment as co-defendant Williams and Defendant.  Thornton told the jury that he had been incarcerated since November 18, 2013, following a high-speed chase with the police.  At the time of his arrest, Thornton was with Motton aka "Pudgy," Sonnier aka "Dut or Dirty," and co-defendant Williams, whom he referred to as "Rob."  Thornton explained that co-defendant Williams and Sonnier are brothers, and he knew them from growing up together in the same neighborhood.

Thornton explained that in November of 2013, he was a passenger in the Mazda driven by Motton when they attempted to evade the police.  He denied seeing co-defendant Williams point a gun at Motton during the pursuit or order him to drive off from the police but admitted to there being a quantity of "mojo" in the car.  Thornton further denied any acquaintance with Defendant and, thus, denied taking possession of cocaine from Defendant at the daiquiri shop prior to entering Motton's car and engaging in the high-speed chase.  Thornton told the jury that he knew of the Harvey Hustlers, but in his opinion, he did not believe they were an organized group with an identifiable leader.  Thornton named Melvin Hudson, Germain Hudson, Tedrick Bernard, Paul Smith aka "Buck," Ellis Landix, Jr., and Corey Trent, as members or associates of the Harvey Hustlers.

Brandon Motton also testified under legal compulsion, pursuant to Louisiana Code of Criminal Procedure article 439.1.  Motton admitted to having prior felony drug convictions and to being charged in the same indictment as co-defendant Williams and Defendant.  He too testified that he was arrested following a police chase in November 2013 but denied being in the Mazda during the chase.  Motton explained that at the time of his arrest, he was in the Day Development Subdivision in Westwego and was hiding from the police because he was on parole, further maintaining that he was not with co-defendant Williams, Sonnier, or Thornton prior to his arrest.  He did however admit to knowing co-defendant Williams and Sonnier.

Paul Smith testified that he was indicted along with co-defendant Williams and pleaded guilty to charges of racketeering, conspiracy to distribute cocaine, conspiracy to distribute heroin and marijuana, possession with intent to distribute oxycodone, and possession with intent to distribute cocaine.  He further admitted to being an active participant in the Harvey Hustlers through which he engaged in various criminal acts which included obtaining and selling narcotics.  He testified that he did not "recall" co-defendant Williams being a member of the group.  When the State confronted Smith with the factual basis made as part of his guilty plea, he testified that he did not "recall" accepting as true the statement that "Members of the Enterprise who engaged in this activity on a daily basis ... included ... Robert 'Lil Rob' Williams."  It was further established that, at the time of his guilty plea,

he swore as true that "Enterprise members and their associates engaged in acts of violence to protect the perceived interests of the Enterprise members, exact revenge upon enemies of the Enterprise members, punish Enterprise members whose conduct displeased Enterprise leaders and to develop the reputation of the Harvey Hustlers as a group to be feared by members of the community."

Harry Smoot testified that he pleaded guilty in federal court to several charges related to drug-trafficking conspiracy that took place between January 1, 2010 through November 20, 2013, wherein he conspired with co-defendant Williams, Sonnier, Frankie Hoofkin, Ray Woodruff, Terrence Kelley, and others to sell drugs. He admitted that, during the course of the conspiracy, he provided drugs, including heroin, cocaine, and marijuana, to other individuals who participated in the conspiracy with the objective towards monetary gains. He testified that he distributed large quantities of drugs to other "small time drug dealers" associated with the Harvey Hustlers, including Keitrel Gumms, Kerry Reynard, Richard Chess, and Bryant Gumms at co-defendant Williams' behest. Smoot testified that at times he saw co-defendant Williams with large sums of money but could not state whether the money was related to any drug transactions. He further testified that co-defendant Williams provided him with some "support and protection" as he transacted his drug business.

Torey Richardson testified that he was incarcerated on federal convictions for "conspiracy to possess firearms, RICO conspiracy and conspiracy to possess 280 grams or more of crack cocaine."[18] Richardson told the jury that he sold drugs obtained from various members of the Harvey Hustlers, including Melvin Hudson, Germain Hudson, Paul Smith, and David Williams. During that time, he also observed co-defendant Williams sell cocaine "a few times" and claimed to know that co-defendant Williams supplied "slabs of cocaine"[19] to other members of the Harvey Hustlers.

[18] Richardson stated that he hoped his testimony would result in a reduction of his sentence.

[19] Richardson defined "slabs" as costing $50, which he would then break down into "rocks" and sell them for $10 to $20 per rock.

Tedrick Reynard was also incarcerated at the time of trial for various federal drug related convictions.[20] Reynard testified that he was a drug dealer in the Scottsdale/Harvey area for eight to nine years. During that time, he was provided with drugs supplied by members and associates of the Harvey Hustlers. Among his suppliers were co-defendant Williams, David Williams, and Melvin Hudson. He acknowledged that at some point a dispute amongst members of the gang broke out and, as a result, David Williams was killed. He testified that after David Williams was killed, co-defendant Williams stepped forward to "run things." He stated that co-defendant Williams was "feared," and, thus, people listened to him.

[20] Reynard also stated that he hoped his testimony would result in a reduction of his sentence.

### *The transportation of narcotics from Texas to Louisiana*

Donald Nance, former State Trooper with the Jefferson County Sherriff's Office in Texas, testified that on April 6, 2014, he received a call from Drug Enforcement Agency (DEA) Agent Mike Lumpkin regarding two vehicles, traveling from Houston on Interstate–10 in the direction of New Orleans, suspected to be carrying contraband. Sergeant Nance was able to locate the caravanning vehicles and effect a stop based on the information he received. Sergeant Nance testified that one of the vehicles—an Acura MDX—was driven by Defendant and inside a "hidden compartment" within the vehicle was $13,000.[21] Detective Eric Bowman, also of the Jefferson County Sheriff's Office, assisted Sergeant Nance in the stop of the vehicles and testified that the second vehicle was driven by Joseph Holmes and was found to contain eight "bundles" of "drugs," later confirmed to be cocaine, hidden underneath the front bumper.[22] Detective Bowman testified that Holmes indicated he was traveling from Texas to Harvey, Louisiana.

[21] Defendant told Sergeant Nance that the vehicle belonged to Nathan Carter.

[22] Michael Cole of the JPSO Crime Laboratory testified as an expert in the analysis and identification of controlled dangerous substances and told the jury that State's Exhibit 77 tested positive for cocaine and contained a total net weight of approximately 7½ kilograms.

Pursuant to the stop by Sergeant Nance and Detective Bowman, Holmes was arrested and pleaded guilty to possession with intent to distribute narcotics. Holmes testified that he and Defendant were traveling together in separate vehicles from Houston, Texas, to Harvey, Louisiana. He stated that he was transporting the cocaine in his vehicle, as he had done on prior occasions, pursuant to his business agreement with Defendant and Nathan Carter. Holmes explained that he would drive from Harvey to Houston and back after retrieving at least 20 kilograms of cocaine per month,[23] paid for by Defendant[24] and on occasion, Carter. He further testified that on his return trip he would always travel with a second vehicle whose purpose was to serve as a "look-out."

[23] Holmes testified that he would travel to Houston to retrieve the narcotics approximately five or six times per month.

[24] Holmes indicated that in November of 2013, Defendant was living in the St. Germaine apartment complex but that he would pick up the money for the narcotics from Defendant at a house on Friendship Drive in Harvey in the months leading up to their April 2014 arrest. At times the quantity of money exceeded $200,000.

Marlon Mercy also testified that he pleaded guilty to charges of racketeering and conspiracy to distribute cocaine in connection with his involvement in the procurement of cocaine to be transported between Texas and Jefferson Parish, Louisiana. He testified that while living in Texas, he worked with Defendant and Carter to obtain multiple kilograms of cocaine ranging in price from $27,500 and $28,000 per kilogram. Mercy testified that on the day of Defendant's and Holmes' arrests, they had obtained cocaine from him in Houston at a man known as "Payday's" apartment. He explained that Defendant tested the product to ensure its quality and then gave him money for the cocaine.

Nathan Carter testified that he too was incarcerated for having pleaded guilty to racketeering and conspiracy to distribute cocaine.  Carter confirmed that he was involved with Defendant, Mercy, and Holmes in the distribution of cocaine from Texas to Jefferson Parish, Louisiana.  He stated that, between November of 2013 and April of 2014, the group transported more than 20 kilograms of cocaine per month to Jefferson Parish.  Once the cocaine was transported to Jefferson Parish, Carter testified that it was then sold at $31,000 per kilogram.  He testified that once in Jefferson Parish, Defendant distributed the cocaine to Sonnier.  Carter told the jury that one time Sonnier complained to him that he had been involved in a police chase in November of 2013, which resulted in the loss of the cocaine he had obtained from Defendant.

### *Wiretap intercepts*

FBI Special Agent Keith Burriss testified as an expert in the field of drugs, weights, prices, distribution of drugs, drug-trafficking, and drug-trafficking organizations.  He explained to the jury that he monitored the wiretaps on co-defendant Williams and Sonnier's cellular phones in 2013.  While monitoring co-defendant Williams' phone conversations in November of 2013, Agent Burriss identified a conversation in which co-defendant Williams and a male named "Minny" discussed the need to "smoke somebody" named "Tosh."  Agent Burriss relayed this information to Detective Roniger, who then took the referenced individual into custody.  In another call, Agent Burriss testified that he heard co-defendant Williams advise a caller that he would be able to supply him with a "hundred dollars' worth" of cocaine since the caller had run out of his supply. Agent Burriss further testified regarding a phone call to co-defendant Williams in which the caller asked about purchasing an ounce of cocaine, to which co-defendant Williams replied, "[o]n Dirty level, not my level."  Agent Burriss believed that to mean that such quantity is not what co-defendant Williams "typically does, it's going to be whatever Dirty typically does."  In the same call, co-defendant Williams also noted that an ounce of cocaine would cost $1,100.  Agent Burriss explained to the jury that with respect to narcotics trafficking in general, 20 kilograms of cocaine could net a profit of $450,000 per month.

Detective Roniger confirmed that he was the affiant on the wiretaps obtained on the phones belonging to co-defendant Williams and Sonnier.  He testified that while monitoring co-defendant Williams' phone, information was received regarding a potential threat to Tosh Toussaint's life at the direction of co-defendant Williams.  Toussaint was ultimately taken into custody on unrelated criminal charges and afforded protection based on the content of the intercepted phone call.

FBI Special Agent Schliem was re-called and testified regarding multiple wiretapped conversations amongst the members of the conspiracy.[25]  Special Agent Schliem testified that among the wiretapped conversations were those between Defendant, Carter, Marlon Mercy, and Holmes regarding the exchange of money

to pay for approximately 20 kilograms of cocaine each month from a supplier in Houston to be transported back to Jefferson Parish. He also testified regarding multiple phone communications involving co-defendant Williams, Keitrel Gumms, Sonnier, and Ray Woodruff relating to drug trafficking and a shooting that occurred at the Lapalco Apartments on April 22, 2013.

[25] Special Agent Schliem also identified a music video entitled "Every Snitch," depicting David Williams aka "Mr. Harvey," Tory Richardson, Kentaz Gayden aka "Kenny Boo," Paul Smith aka "Buck," Carlnell Pierce, Tedrick Reynard, and Chad Jones.

### *The Murder of Donte Hall*

Detective Travis Eserman of the JPSO testified that he was the lead investigator assigned to the November 16, 2013 shooting death of Donte Hall, whose body was found outside of 2629 Pelican Bay Boulevard, Marrero, Louisiana. Detective Eserman testified that Hall was shot at approximately 7:00 p.m. in the middle of the street in a residential neighborhood and that Defendant was developed as a suspect. At the scene of the homicide, firearm casings were recovered and preserved for analysis. Additionally, three residences with security camera views of the homicide scene were retrieved and analyzed. Hall's cell phone records were also obtained,[26] and it was noted that there were over 50 phone calls between phones registered to Hall and Defendant on the day before his murder and on the day of his murder. There were also numerous phone calls between Hall and Leroy Bird, a close friend of Hall, who advised Detective Eserman of Hall's activities leading up to his murder. Information provided by Bird led Detective Eserman to an apartment in the St. Germaine Apartment Complex, Apt. F–301, used by Defendant. After speaking with the leasee of the apartment—Robin Toussaint— Detective Eserman obtained Defendant's phone number and then his cell phone records. From the phone records it was determined that the last phone call between Defendant and Hall was at 6:41 p.m., approximately 19 minutes before Hall was murdered.

[26] Kerry Walker, records custodian for Sprint Corporation, provided phone records for telephone number (504) 236-7867, belonging to Donte Hall.

Robin Toussaint testified that she rented an apartment at the direction of Defendant[27] at the St. Germaine Apartment Complex located at 2101 Manhattan Boulevard, apartment F–301.[28] Ms. Toussaint never lived at the apartment but was asked by the apartment manager to come to the apartment to speak with the police about a murder investigation, at which time she provided the police with Defendant's phone number and identified Smith from a photograph.

[27] Defendant paid the rent and security deposit for the apartment.
[28] Ms. Toussaint leased the apartment from April 30, 2013 until March 1, 2014.

Leroy Bird, a friend of Hall's and an incarcerated felon serving 15 years in prison, testified that Hall introduced him to Defendant, who would supply him with cocaine which he would then sell. He testified that he spoke to Hall less than an hour before Hall's murder and that during their conversation, Hall told him he was "going to go ride with Bug [Defendant]." He explained that the day before Hall's murder, Hall had set up a drug deal between Defendant and another individual, but

instead of conducting the drug transaction, Defendant had been robbed and thus believed Hall "had something to do with it." He further testified that on the day Hall was murdered, he warned Hall not to go with Defendant, to which Hall replied, "I'm not going to let that p***y a** kill me ... if he come by hisself [sic], I'm going to go with him. If he come with people in the car, I ain't going with him." Bird attempted to call Hall approximately 30 minutes after their conversation but received no answer. Thus, when Bird learned of Hall's murder, he informed the police where Defendant lived, admitting that he wanted to kill Defendant himself for what he had done.

Maya Jackson testified that she was acquainted with Defendant and Hall. She testified that she was with Hall on the evening of his murder and saw Defendant pick up Hall in a black Infiniti.[29] She also noticed a white vehicle speed off behind Defendant's vehicle after picking up Hall.[30]

[29] On cross-examination Bird admitted that he was originally brought in for questioning as a suspect in Hall's murder because of the similarities between his vehicle and the white car seen following the black Infiniti.

[30] Maya's mother, Marshanda Jackson, testified that on the day before Hall was murdered, she saw him enter Defendant's car, remain inside for approximately seven to ten minutes, and then exit the car. She further testified that on the day of Hall's murder, her daughter Maya reported to her that Hall had left the neighborhood with Defendant and that a "white car went flying behind them."

Jeanine Gonzales also testified that while driving on Lafitte Highway, a black vehicle followed by a white vehicle passed her at a very high rate of speed.

Nathan Carter also told the jury that four hours prior to Hall's murder, he spoke to Defendant who informed him that Hall had "set him (Defendant) up to be ripped off in a drug transaction," and that he intended on "getting him back." Carter took this to mean that Defendant was going to "rob, harm, or kill" Hall, so he advised him "not to do it." The next time Carter spoke with Defendant he indicated to him that "it was done," and "no one knew he had done it and that he didn't have anything to worry about."[31]

[31] Detective Travis Eserman testified that there were 56 phone calls between the phone number associated with Defendant's and Hall's phone numbers between November 14, 2013 and Hall's death on November 16, 2013. In the same period, there were also 26 phone calls between Defendant and Carter.

Jene Rauch of the JPSO Crime Laboratory testified as an expert in firearm and toolmark identification and shooting incident reconstruction. Based upon her analysis of the ballistics material in the Hall shooting, she concluded that "at least three guns" were discharged at the scene. The casings were consistent with having been fired from at least one 9 mm weapon and two .40 caliber weapons.

At the conclusion of the trial on November 6, 2015, the jury returned verdicts of guilty as charged on all counts against Defendant except on count seventeen, the second degree murder of Donte Hall, which resulted in a hung jury.[32,33]

[32] On April 25, 2016, the State dismissed the second degree murder charge for the death of Donte Hall (count seventeen) against Defendant.

[33] Co-defendant Williams was found guilty as charged on all counts.

## III. Petitioner's Claims

### A.    Sufficiency of Evidence

Smith first claims that the evidence was insufficient to support his conviction as to count nineteen, possession with the intent to distribute cocaine on November 18, 2013.  Smith argues that he was not in actual or constructive possession of the cocaine.  He claims that the evidence was circumstantial and failed to show he was in possession of the cocaine beyond a reasonable doubt.  The state responds that the evidence at trial was sufficient to prove beyond a reasonable doubt that Smith constructively possessed the cocaine.

On direct appeal, the Louisiana Fifth Circuit addressed the sufficiency of the evidence as to count nineteen and found as follows[17]:

### Denial of Motion for New Trial[34]

Defendant asserts the State failed to present sufficient evidence to establish that he possessed cocaine with the intent to distribute on November 18, 2013—the crime alleged in count nineteen.  Specifically, Defendant maintains that neither actual nor constructive possession of cocaine by Defendant was supported by the evidence presented at trial and, thus, concludes the elements of the crime were not proven beyond a reasonable doubt.  Accordingly, Defendant avers that the trial court erred in failing to grant his motion for new trial based upon the sufficiency of evidence for the charge of possession with intent to distribute cocaine.

[34] When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence.  State v. Hearold, 603 So.2d 731, 734 (La. 1992).  If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary.  Id.  Alternatively, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must consider the assignments of trial error to determine whether the accused is entitled to a new trial.  Id.  Therefore, the sufficiency of the evidence is addressed before Defendant's other assignments of error.  See also State v. Nguyen, 05-569 (La. App. 5 Cir. 2/3/06); 924 So.2d 258, 262.

Conversely, the State argues that the evidence it presented proved beyond a reasonable doubt that Defendant possessed cocaine with the intent to distribute on November 18, 2013.

[17] Smith, 227 So.3d at 351-55; State Rec., Vol. 12 of 17.

On November 17, 2015, Defendant filed a motion for new trial claiming the verdict on count nineteen was contrary to the law and evidence as the testimony adduced was clear that no witnesses observed him in possession of cocaine on November 18, 2013, and therefore, he could not have possessed cocaine with the intent to distribute on that date.[35]  The denial of a defendant's motion for new trial, based on La. C.Cr.P. art. 851(B)(1), presents nothing for review on appeal.  State v. Hampton, 98–331 (La. 4/23/99); 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Condley, 04-1349 (La. App. 5 Cir. 5/31/05); 904 So.2d 881, 888, writ denied, 05-1760 (La. 2/10/06); 924 So.2d 163.  However, the Louisiana Supreme Court and this Court have addressed the constitutional issue of sufficiency of the evidence under such circumstances.  See Hampton, supra; Condley, supra; State v. Lyles, 03-141 (La. App. 5 Cir. 9/16/03); 858 So.2d 35; State v. Pascual, 98-1052 (La. App. 5 Cir. 3/30/99); 735 So.2d 98.  Therefore, we find that the denial of Defendant's motion for new trial based on the sufficiency of the evidence is properly before this Court on review.

[35] Defendant failed to file a motion for post-verdict judgment of acquittal challenging the sufficiency of the evidence pursuant to La. C.Cr.P. art. 821.  Although he filed a motion for new trial, procedurally there is a distinction between the two motions.  However, such failure does not preclude appellate review of the sufficiency of the evidence.  State v. Washington, 421 So.2d 887, 889 (La. 1982); State v. Brown, 01-41 (La. App. 5 Cir. 5/30/01); 788 So.2d 694, 699.

The ruling on a motion for new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only where there is a clear showing of abuse of that discretion.  State v. Battie, 98-1296 (La. App. 5 Cir. 5/19/99); 735 So.2d 844, writ denied, 99–1785 (La. 11/24/99); 750 So.2d 980.  The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See State v. Ortiz, 96-1609 (La. 10/21/97); 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998); State v. Bailey, 04-85 (La. App. 5 Cir. 5/26/04); 875 So.2d 949, 954–55, writ denied, 04-1605 (La. 11/15/04); 887 So.2d 476, cert. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005).  Under the Jackson standard, a review of a criminal conviction record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt.  State v. Flores, 10-651 (La. App. 5 Cir. 5/24/11); 66 So.3d 1118, 1122.  Rather, the reviewing court must decide whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.  Id.; State v. Holmes, 98-490 (La. App. 5 Cir. 3/10/99); 735 So.2d 687, 690.

It is not the function of the appellate court to assess credibility or re-weigh the evidence.  State v. Smith, 94-3116 (La. 10/16/95); 661 So.2d 442, 443.  The trier of fact shall evaluate credibility, and when faced with a conflict in testimony, is free to accept or reject, in whole or in part, the testimony of any witness.  State v. Bradley, 03-384 (La. App. 5 Cir. 9/16/03); 858 So.2d 80, 84, writ denied, 03-

2745 (La. 2/13/04); 867 So.2d 688. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient to support a requisite factual finding. State v. Caffrey, 08-717 (La. App. 5 Cir. 5/12/09); 15 So.3d 198, 202, writ denied, 09-1305 (La. 2/5/10); 27 So.3d 297.

Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La. App. 5 Cir. 5/31/05); 904 So.2d 830, 833. In other words, circumstantial evidence is evidence which proves a fact, and from that fact one may indirectly but reasonably and logically conclude another fact which is sought to be proven. State v. Khanh Le, 13-314 (La. App. 5 Cir. 12/12/13); 131 So.3d 306, 313.

When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Wooten, 99-181 (La. App. 5 Cir. 6/1/99); 738 So.2d 672, 675, writ denied, 99-2057 (La. 1/14/00); 753 So.2d 208. This is not a separate test from the Jackson standard but rather provides a helpful basis for determining the existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Harrell, 01-841 (La. App. 5 Cir. 2/26/02); 811 So.2d 1015, 1019.

In this case, Defendant challenges his conviction on count nineteen, possession with intent to distribute cocaine, a violation of La. R.S. 40:967. To prove that offense, the State was required to show that Defendant knowingly and intentionally possessed cocaine and that he did so with the specific intent to distribute it. State v. Clark, 05-61 La. App. 5 Cir. 6/28/05; 909 So.2d 1007, 1011–12, writ denied, 05-2119 (La. 3/17/06); 925 So.2d 538. Guilty knowledge is an essential element to the crime of possession of contraband, and such knowledge may be inferred from the circumstances. State v. Manson, 01-159 (La. App. 5 Cir. 6/27/01); 791 So.2d 749, 761, writ denied, 01-2269 (La. 9/20/02); 825 So.2d 1156. Possession can be either "actual" or "constructive." State v. Brisban, 00-3437 (La. 2/26/02); 809 So.2d 923, 929, writ denied, 03-3054 (La. 12/10/04); 888 So.2d 824.

Here, Defendant claims the State failed to prove his actual and/or constructive possession of cocaine on November 18, 2013. Since the only statutory element of the crime challenged by Defendant is the element of possession, the sufficiency of the evidence with respect to the remaining statutory elements need not be addressed. See State v. Henry, 13-558 (La. App. 5 Cir. 3/26/14); 138 So.3d 700, 715, writ denied, 14-0962 (La. 2/27/15); 159 So.3d 1064; State v. Ramirez, 09-350 (La. App. 5 Cir. 12/29/09); 30 So.3d 833, 840; State v. King, 05-553 (La. App. 5 Cir. 1/31/06); 922 So.2d 1207, 1211–13, writ denied, 06-1084 (La. 11/9/06); 941 So.2d 36.[36]

[36] However, a review of the record under State v. Raymo, 419 So.2d 858, 861 (La. 1982), reflects the State presented sufficient evidence to establish the remaining statutory elements of the crime.

Although Defendant was not found in actual possession of the cocaine on November 18, 2013, we find he was at least in constructive possession. A person not in physical possession of a drug may have constructive possession when the contraband is under the person's dominion and control. State v. Schieffler, 00–1116 (La. App. 5 Cir. 2/13/02); 812 So.2d 7, 9, writ denied, 02-0712 (La. 9/13/02); 824 So.2d 1188. The key factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession are the defendant's knowledge that illegal drugs were in the area, his relations with a person found to be in actual possession, the defendant's access to the area where the drugs were found, evidence of recent drug use by the defendant, the existence of drug paraphernalia, and evidence that the area was frequented by drug users. Id.; Manson, 791 So.2d at 761. After considering these factors, we find that the circumstantial evidence presented at trial established that Defendant exercised sufficient constructive possession of the cocaine to find him guilty of the offense.

The jury heard detailed testimony concerning the facts and circumstances leading up to the November 18, 2013 meeting at the daiquiri shop on Manhattan Boulevard, which formed the basis for the challenged conviction. Specifically, in the weeks leading up to the daiquiri shop meeting between Defendant and co-defendant Williams' cohorts, surveillance of co-defendant Williams and Sonnier established their involvement in other narcotics transactions utilizing the same modus operandi as the one engaged in with Defendant on November 18, 2013. Agent Boudreaux testified that like the meeting at the daiquiri shop, the previous narcotics transactions also began with intercepted phone conversations establishing a meeting location, and then once at the location, Sonnier would exit the vehicle, "go in the other person's vehicle for a very short period of time, and then return and then depart." Agent Boudreaux testified that the amount of time Sonnier would remain in the other person's vehicle was consistent with the amount of time it would take to conduct a hand-to-hand drug transaction. The testimony further established that the November 18, 2013 meeting with Defendant was no different.

On the day in question, several intercepted text and phone communications between Defendant and Sonnier confirmed their meeting location at the daiquiri shop on Manhattan Boulevard. Through the intercepted communications, the duo confirmed the quantity of cocaine to be purchased. In the meantime, Sonnier's effort to obtain money for the transaction was also intercepted along with a phone call to Willie Thornton, during which he advised Thornton that they would be obtaining cocaine for which he needed Thornton's assistance in cooking it down into crack cocaine. Thus, the evidence established that Thornton accompanied Sonnier and co-defendant Williams to the daiquiri shop, where, as planned, Defendant arrived to meet them.

Based upon these intercepted communications, surveillance was put in place at the daiquiri shop. Upon Defendant's arrival, Agent Boudreaux positively identified Defendant as he exited his vehicle and approached Sonnier who was standing outside talking to Thornton. He noted that Defendant was very "observable" due to the stark contrast between Defendant's short stature as compared to co-defendant Williams, Sonnier, and Thornton. Agent Boudreaux further told the jury that after speaking to Sonnier, Defendant then escorted Thornton back to his vehicle where two other unidentified individuals exited Defendant's Nissan and served as "lookouts" while Thornton and defendant got into the car. Approximately one minute later, Thornton exited the Nissan and went back to where co-defendant Williams and Sonnier were standing. Based on the wireless intercepts and his observations at the daiquiri shop, Agent Boudreaux testified that he believed Defendant sold drugs to Thornton and his associates.

The evidence further established that after the narcotics transaction, Sonnier's vehicle left the daiquiri shop and a high-speed police chase ensued during which a text message was intercepted between Sonnier and Defendant that read, "U serious fool?" After the chase, cocaine was recovered from the roadside having been discarded from Sonnier's vehicle during the police pursuit. Additional text and phone communications subsequent to the chase revealed Sonnier's belief that Defendant tried to set him up given the fact that the police pursuit occurred shortly after leaving the daiquiri shop and where Sonnier indicated he had given $5,000 to Defendant. Testimony elicited at trial further established that in 2013, $5,000 would be in the price range for the amount of cocaine recovered from the side of the road that had been discarded from Sonnier's vehicle during the high-speed chase.

Defendant does not offer an alternative hypothesis of innocence, rather, he argues that the State failed to prove his actual or constructive possession of the cocaine. The facts and circumstances, however, support the inference that Defendant constructively possessed the cocaine while inside his vehicle and that he distributed it to Thornton before the police intercepted Sonnier's vehicle—occupied by Sonnier, Thornton, and co-defendant Williams—from which the cocaine was discarded.

The jury's verdict reflects the reasonable conclusion that, based on the Schieffler factors, the text and phone communications intercepted between Sonnier and Defendant leading up to the daiquiri shop meeting, the testimony of the police officer conducting the surveillance, and the physical evidence recovered from the roadside, establish that Defendant was in constructive possession of the cocaine on November 18, 2013.[37] Accordingly, we find that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that Defendant was guilty of possession with intent to distribute cocaine. Thus, the trial court did not abuse his discretion in denying Defendant's motion for new trial.

[37] See State v. Williams, 11-1298 (La. App. 4 Cir. 6/20/12), 97 So.3d 428, writ denied, 12-1672 (La. 2/8/13), 108 So.3d 78, where the defendant contended on appeal that the evidence was

insufficient to establish that he knowingly possessed cocaine with the intent to distribute it. On appeal, the Fourth Circuit found that although the defendant was not found to be in possession of the crack cocaine at the time of his arrest, the evidence at trial was sufficient to establish his guilt beyond a reasonable doubt. The court noted that the jury heard testimony from a detective that during surveillance of an area known for drug trafficking, he observed the defendant engage in two transactions where the visitor would hand the defendant currency and in turn would receive "an object" from the defendant. Although the defendant was never found in possession of crack cocaine, the court held that it could be inferred from the testimony that the defendant knowingly and intentionally distributed crack cocaine to the two buyers who were apprehended with crack cocaine in their pockets. Moreover, the court went on to note that currency of various denominations was found in the defendant's pocket, supporting a reasonable inference that the defendant distributed the crack cocaine to the two buyers and had used up his crack cocaine supply momentarily. Accordingly, the court concluded that the evidence supported the finding that the defendant possessed the cocaine with the intent to distribute it.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[18]

Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Davila v. Davis, 650 F. App'x 860, 866 (5th Cir. 2016), aff'd, 137 S. Ct. 2058 (2017). For the following reasons, the Court finds that he has made no such showing.

In this case, the Louisiana Fifth Circuit Court of Appeal correctly identified the controlling federal law concerning such claims: Jackson v. Virginia, 443 U.S. 307 (1979). Under Jackson, the question before a court is not "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (citation and quotation marks omitted). In other words, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision

---

[18] State v. Smith, 252 So. 3d 481 (La. 2018); State v. Smith, 252 So. 3d 482 (La. 2018); State Rec., Vol. 17 of 17.

to convict or acquit.' " Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (emphasis added) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)).

In addition, despite Smith's argument to the contrary, Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does *not* apply in federal habeas corpus proceedings; in these proceedings, *only* the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 566 U.S. at 655 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Lastly, because the Jackson standard is itself deferential, and because the AEDPA's standards of review are also deferential, a federal habeas court's review of a sufficiency of the evidence claim is in fact "twice-deferential." Parker v. Matthews, 567 U.S. 37, 43 (2012); see also Coleman v. Johnson, 566 U.S. 650, 651 (2012). Further, under the AEDPA, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." Cavazos v. Smith, 565 U.S. 1, 2 (2011)

(quotation marks omitted).  As a result, "[b]ecause rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold."  Id.

Mindful of these principles, the Court finds that Smith's claim must be rejected for the following reasons.

In count nineteen, Smith was charged with and found guilty of possession with the intent to distribute cocaine on November 18, 2013.  In Louisiana, it is unlawful for a person knowingly or intentionally to possess with the intent to distribute a Schedule II controlled dangerous substance, which includes cocaine.  La. Rev. Stat. § 40:967(A)(1); La. Rev. Stat. § 40:964, Schedule II(A)(4). To support a conviction for possession of a controlled dangerous substance with intent to distribute it, the state is required to prove both possession and specific intent to distribute it.  See State v. Young, 764 So. 2d 998, 1006 (La. App. 1st Cir. 2000).  Possession exists when the defendant exercised either actual or constructive possession of the cocaine.  State v. Jones, 985 So. 2d 234, 241 (La. App. 5th Cir. 2008).  Actual possession occurs when the person has direct physical contact with and control of the object.  State v. Bright, 860 So. 2d 196, 205 (La. App. 5th Cir. 2003).  A person has constructive possession when the drugs are under his dominion and control even if not on his person.  State v. Manson, 791 So.2d 749, 761 (La. App. 5th Cir. 2001).

Factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession include the defendant's (a) knowledge that drugs were in the area, (b) relationship with the person found to be in actual possession, (c) access to the area where the drugs were found, (d) recent drug use and (e) physical proximity to the drugs.  State v. Toups, 833 So.2d 910, 912 (La. 2002).  Guilty knowledge, as an essential component of

constructive possession, may be inferred from the circumstances of the case.  State v. Pigford, 922 So. 2d 517, 521 (La. 2006).

To prove Smith's constructive possession of the cocaine, the state presented the testimony of Special Agent Schliem.  Schliem testified he was monitoring the wiretaps on November 18, 2013, and that the data from the wiretaps indicated that Sonnier was trying to acquire drugs.[19]  Specifically, a person called "Bug" or "Bull," who Schliem determined was petitioner, called Sonnier at 3:17 p.m., at which time Sonnier asked for "three of them."[20]  Based on the call, Schliem believed that there was going to be a purchase of multiple ounces of cocaine and arranged for surveillance at the agreed upon location, and eventually a takedown of one of the vehicles.[21]

Schliem testified that Smith called Sonnier again at 4:22 p.m., and that Schliem had no doubt that the calls related to a drug transaction.[22]  Schliem testified regarding a call by Sonnier to secure the necessary funds to complete the purchase.[23]  He explained that Sonnier also called Willie Thornton and asked him to "work his magic," which Schliem explained meant to convert cocaine to crack cocaine.[24]  Schliem testified that Sonnier and Smith communicated with one another via text messages as well as through another phone call before they met ultimately at a daiquiri shop in Harvey.[25]

After the Sonnier and Smith met, a police chase of Sonnier's vehicle occurred, during which Smith received a text message from Sonnier which stated, "You serious fool?"[26]  A text message

---

[19] State Rec., Vol. 6 of 17, trial transcript of October 30, 2015, at pp. 34-37; State Rec., Vol. 8 of 17, trial transcript of November 2, 2015, at pp. 60-61.
[20] Id., at pp. 36-37; State Rec., Vol. 7 of 17, trial transcript (con't) of October 30, 2015, at p. 100; State Rec., Vol. 8 of 17, trial transcript of November 2, 2015, at p. 124.
[21] State Rec., Vol. 8 of 17, trial transcript of November 2, 2015, at p. 124.
[22] State Rec., Vol. 7 of 17, trial transcript (con't) of October 30, 2015, at pp. 101-02.
[23] Id., at pp. 102-05.
[24] Id., at pp. 106-07.
[25] Id., at pp. 38-39, 41-43.
[26] Id., at pp. 44-46; State Rec., Vol. 8 of 17, trial transcript of November 2, 2015, at p. 64.

from Sonnier's phone to another phone number claimed that he was set up, had spent $5,000, and had gotten pulled over.[27]   Sonnier's phone sent another text message to a third phone number and explained that he had gotten into a high speed chase and lost "5 racks," but was he going to go "find it," and he thought he had been set up.[28]   Schliem testified that a "rack" was a common term in the drug world for $1000.[29]   Schliem also testified regarding a intercepted telephone call from Sonnier to Robert Williams during which Sonnier said he was out in Westwego trying to retrieve "the stuff" they threw out the window.[30]

The jury also heard testimony from Special Agent Lon Boudreaux of the Federal Bureau of Investigation, who was involved in surveillance activity on November 18, 2013.[31]   Boudreux testified that law enforcement set up surveillance near a daiquiri shop.[32]   At some point, he saw Smith approach Sonnier and Thornton.[33]   Boudreaux testified that he believed that Smith was there to deal drugs to Sonnier, Williams, and their companions.[34]   Boudreux observed Smith get into the driver's seat of his car and Thornton get into the passenger seat.[35]   While Smith and Thornton were in the car, two men who had arrived in Smith's vehicle with Smith stood watch as "lookouts."[36]   Thornton got out of Smith's car after a minute or two and then he, Williams, Sonnier, and a woman got into a Mazda driven by Brandon Motton and the vehicle left the parking lot.[37]   Boudreaux followed the vehicle and a high speed pursuit ensued.[38]   Shortly after the vehicle was located

---

[27] State Rec., Vol. 8 of 17, trial transcript of November 2, 2015, at p. 66.
[28] Id., at p. 68.
[29] Id., at p. 69.
[30] Id., at pp. 81, 94.
[31] State Rec., Vol. Vol 7 of 17, trial transcript of November 2, 2015, at pp 68-69.
[32] Id., at pp. 71-72.
[33] Id., at p. 77.
[34] Id., at pp. 81-82.
[35] Id., at p. 82.
[36] Id., at pp. 86, 113.
[37] Id., at pp. 82, 86-87.
[38] Id., at pp. 87, 89-90.

abandoned, only Motton and Thornton were apprehended nearby.[39]  A search of the route the car traveled during the chase revealed a Glock .45 and an 8 ball of crack cocaine in a little plastic bag.[40]  Detective Roniger also found another amount of cocaine discarded along the route.[41]

Stated simply, there was sufficient evidence upon which jurors could indeed rationally conclude, as explained by the Louisiana Fifth Circuit, that Smith possessed cocaine with an intent to distribute it.  To summarize: when the evidence in the instant case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict as to count nineteen was irrational.  Therefore, Smith cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, under the doubly deferential standards of review which must be applied by this federal habeas court, Smith's claim should be denied.

## B.     Denial of Motion to Suppress

Smith next claims that the trial court erred in denying his motion to suppress the intercepted telephone calls obtained via federal wiretaps.  Smith argues that, while the wiretaps comported with federal requirements, they did not satisfy the requirements of the Louisiana Constitution and Louisiana's Electronic Surveillance Act.  He specifically contends that the confidential informants used for the wiretaps were not presented to the judge authorizing the wire, and, further, that the authorizing federal judge is not a person authorized to issue the wiretap under Louisiana law.

---

[39] Id., at pp. 90-91.
[40] Id., at p. 93.
[41] Id.

Smith's trial counsel filed a motion to suppress the evidence obtained through electronic surveillance.[42]   The trial court held a hearing on the matter on October 26, 2015.[43]   After considering the arguments of the parties, the trial court found that "the rights of the defendants are protected, and that a properly authorized federal wiretap may be used in a state court prosecution."[44]

On direct appeal, the Louisiana Fifth Circuit denied Smith's claim relating to the denial of the motion to suppress holding[45]:

### Denial of Motion to Suppress

Defendant argues it was error for the trial court to declare the results of the wiretap evidence admissible at trial without requiring the State to satisfy its burden of proof.  Specifically, Defendant maintains that while the wiretap evidence was obtained pursuant to purported compliance with federal wiretap requirements, the wiretaps did not satisfy the requirements of the Louisiana Constitution and Louisiana's Electronic Surveillance Act—La. R.S. 15:1301, *et seq.*  Defendant contends that federal authorizations for electronic intercepts are not approved by a judge or "attorney for a governmental entity" as required under Louisiana law.  He further maintains that while federal wiretap requirements do not mandate the presentation of confidential informants to the issuing judicial authority for determination regarding credibility and reliability, the Louisiana state statute does require the informant(s) to be presented to the issuing judge.  Accordingly, Defendant concludes that because the evidence obtained from the federal wiretaps were obtained in a manner wholly contrary to Louisiana law, the wiretap evidence should have been suppressed as "fruits of the poisonous tree."

On October 23, 2015, Defendant filed a "Motion to Suppress Evidence Obtained in Violation of Louisiana Revised Statute 15:1301, *et seq.*, and in Violation of the Louisiana Constitution Article 1, Section 5's Right to Privacy."  On October 26, 2015, the trial court heard and denied Defendant's motion to suppress wiretaps.  In his motion and at the motion to suppress hearing, Defendant argued the federal wiretap warrants used to obtained electronic surveillance on his telephone, while procured in compliance with federal law, did not comport with the requirements set forth by the State of Louisiana under its Electronic Surveillance Act and, therefore, should be deemed inadmissible in a Louisiana state court

---

[42] State Rec., Vol. 2 of 17, Motion to Suppress Evidence Obtained in Violation of Louisiana Revised Statute 15:1301 et seq. and in Violation of the Louisiana Constitution Article 1, Section 5's Right to Privacy filed October 23, 2015.
[43] State Rec., Vol. 6 of 17, hearing transcript of October 26, 2015.
[44] Id., at p. 25.
[45] Smith, 227 So. 3d at 355-360; State Rec., Vol. 12 of 17.

proceeding. Defendant cited two examples in which the federal wiretap warrants did not conform to the requirements of La. R.S. 15:1301, *et seq*. First, he claimed that the Louisiana act requires the signature of a state court judge for the authorization of a wiretap; and second, he claimed the federal authorization for the wiretaps did not comply with Louisiana law governing statements of informants and the requirement that any informant used in an application be presented to the issuing judge.

At the hearing, the State acknowledged that the informants were not presented to a judge for questioning; however, it noted that such requirement is unnecessary when obtaining a wiretap from a federal court judge as occurred in this case. The State maintained that the federal government obtained a valid authorization for the wiretaps in this case, having met all procedural requirements mandated by federal law.

In denying Defendant's motion to suppress, the trial court found the rights of "the defendants are protected, and that a properly authorized federal wiretap may be used in a state court prosecution."

In a hearing on a motion to suppress, the State shall have the burden of proof in establishing the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant. La. C.Cr.P. art. 703(D); State v. Rogers, 09-13 (La. App. 5 Cir. 6/23/09); 19 So.3d 487, 493, writ denied, 09-1688 (La. 4/9/10); 31 So.3d 382. A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent abuse of that discretion. State v. Lee, 05-2098 (La. 1/16/08); 976 So.2d 109, 122, cert. denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008); Rogers, supra.

The area of electronic surveillance is governed by federal law. The Federal Wiretap Act, 18 U.S.C. §§ 2510 *et seq*., was first enacted as part of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and was later substantially amended by the Electronic Communications Privacy Act of 1986. See Pub.L. 90–351, 82 Stat. 212 (1968); Pub.L. 99–508, 100 Stat. 1848, 1851 (1986). This Chapter of the United States Code strictly regulates the interception and derivative use of certain protected communications and provides criminal, civil, and evidentiary sanctions for the violation of its provisions. Id. It also allows certain express exceptions to its prohibition of the interception and use of protected communications, among which is a procedure by which specified federal officials may obtain, under limited circumstances, a judicial wiretap order authorizing surveillance of protected communications. See 18 U.S.C. §§ 2517, 2518.

The Federal Wiretap Act also contains express authority for the states to adopt "little wiretap" acts authorizing their law enforcement personnel to obtain similar wiretap orders from state judges. See 18 U.S.C. § 2516(2); State v. Neisler, 94–1384 (La. 3/9/95); 655 So.2d 252, 257, reversed in part on other grounds, (La. 1/19/96); 666 So.2d 1064. Pursuant to Title III, 18 USCA § 2516(2), states are

authorized "to adopt coordinate statutes permitting the interception of wire, oral, or electronic communications, and to grant greater, but not lesser, protection than that available under federal law." Commonwealth v. Spangler, 570 Pa. 226, 231–32, 809 A.2d 234 (Pa. 2002). See also Bishop v. State, 241 Ga. App. 517, 526 S.E.2d 917 (Ga. Ct. App. 1999); Commonwealth v. Barboza, 54 Mass.App.Ct. 99, 763 N.E.2d 547 (Mass. 2002). A state court may construe the procedural requirements of its electronic surveillance law more strictly than federal courts, thereby giving added meaning to the state's constitutional or statutory guarantee of privacy. James G. Carr, The Law of Electronic Surveillance, § 2.4(a) (2002).

A majority of jurisdictions, including Louisiana, have followed the federal government and enacted electronic surveillance statutes patterned after Title III. Louisiana's Electronic Surveillance Act, La. R.S. 15:1301, et seq., like the Federal Wiretap Act, makes unlawful the interception and disclosure of "wire," "electronic," or "oral" communications, as these terms are defined in the act, by "any person." La. R.S. 15:1303(A). In the case of an "unauthorized (unlawful) interception of such communications, civil and criminal sanctions, as well as an evidentiary exclusionary provision, comprise the remedies available to 'aggrieved' parties." Neisler, 655 So.2d at 258. The exclusionary remedy provides that "[w]henever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding." See La. R.S. 15:1307(A).

However, Louisiana's Act, like its federal counterpart, contains several exceptions to its blanket prohibition of the interception of protected communications. Specifically, La. R.S. 15:1308 allows the attorney general, or the district attorney in whose district the interception will take place, to authorize an application to a state judge for an order approving the interception for the investigation of certain crimes, including violations of the Uniform Controlled Dangerous Substance Act, La. R.S. 40:961, et seq., under which defendants in this case have been charged.

In order to obtain a wiretap under the act, a specified procedure must be followed. See La. R.S. 15:1310(A)-(G). In this case, Defendant argues that the state procedure concerning the presentment of the confidential informants used as a basis for obtaining the wiretap was ignored. In particular, La. R.S. 15:1310(B)(1) states:

> If statements of an identified or unidentified informant are relied upon in the application as a basis for establishing that there are reasonable grounds to believe that an offense has been, is being, or is about to be committed, the application shall set forth the factual basis for the affiant's belief that the informant is credible and that the information has been obtained in a reliable manner. *The informant shall be presented to the judge and be sworn to afford the*

*judge opportunity to inquire if the statements made in the application are true. The application shall so state that the informant was presented to the judge and sworn for such purpose.* This provision shall not affect the privileged character of the identity of an informant. Nothing herein shall be construed to require the identification of a confidential informant.

(Emphasis added).

The validity of a wiretap order may be challenged in a motion to suppress the evidence obtained from that order. The state act delineates three scenarios when a motion to suppress may lie: (1) the communication was unlawfully intercepted; (2) the order of authorization or approval was facially insufficient; or (3) the interception was not made in conformity with the order of authorization or approval. La. R.S. 15:1310(H)(1). If any of these grounds are established by the "aggrieved" party, all evidence obtained from the wiretap order must be suppressed in accordance with La. R.S. 15:1307.

As previously mentioned, this case arose from a federal investigation conducted by a task force into drug trafficking in Jefferson Parish that resulted in federal and state indictments. Here, Defendant does not contest that the wiretaps in this case were lawfully obtained under federal law. However, Defendant argues their invalidity based on the failure to follow state law. He maintains, that the communication was unlawfully intercepted having failed to comply with the procedural mandates set forth under Louisiana's Act. In particular, he cites to La. R.S. 15:1302(13) and 15:1310(B)(1) alleging the government's failure to obtain a state court judge's authorization for the wiretap, and the failure to present the informants used in the affidavit to the judge who issued the wiretap order, in support of the suppression of the wiretap evidence. However, because the wiretap orders in this case were issued by a federal judge under federal law having complied with all the necessary federal procedural mandates for a lawful intercept, the better question is whether a lawfully intercepted federal wiretap can be used in a state court prosecution. The trial court answered this question in the affirmative, finding no law to the contrary. Had the wiretap orders been sought and issued with the alleged deficiencies in state court pursuant to the Louisiana Act, a valid argument could potentially be made regarding their suppression.[38] However, this is not the case here.

[38] See State v. Neisler,94–1384 (La. 1/18/96); 666 So.2d 1064, where, on original hearing, the Louisiana Supreme Court suppressed evidence obtained from wiretaps because the officers failed to comply with the state Act's mandatory requirement that the officers present their confidential informant to the issuing judge. See State v. Neisler, 655 So.2d 252 (La. 1995). On rehearing, the court recognized that the officers technically violated the state Act. Neisler, 666 So.2d at 1068. The court held, however, that "the necessity for suppressing evidence under the exclusionary rule of Section 1307 is an entirely separate question." Id. The court further held, "[t]he crucial issue becomes whether evidence must be suppressed ... in every case of a failure to follow every statutory requirement [of the pertinent section of the state Act] in obtaining a wiretap order." Id. In reversing its prior holding, the court relied on case law in which the court had recognized that a search warrant may be valid even when the supporting affidavit contained inaccurate information,

if suppressing the evidence would not deter deliberate and fraudulent police behavior. Id. (citing State v. Rey, 351 So.2d 489 (La. 1977)). The Neisler court concluded that it must arrive at a "reasonable and just accommodation between an accused's interest in limiting invasions of his or her privacy to those based upon a magistrate's determination of probable cause and society's interest in using reliable evidence to convict those who violate criminal laws." Id. (citing State v. Lehnen, 403 So.2d 683, 686 (La. 1981)). Finally, in affirming the court of appeal's decision not to suppress the evidence, the court stated that suppression "is simply too high a price to pay to assure technical compliance with a statute whose purpose was otherwise served by the commendable police work in the present case." Neisler, 666 So.2d at 1069.

On its face, the Louisiana wiretap law does not prohibit the use of federally obtained wiretap evidence. However, in the absence of Louisiana jurisprudence on point, we find that a look towards other jurisdictions for guidance is warranted.

In State v. Minter, 116 N.J. 269, 561 A.2d 570 (N.J. 1989), federal agents conducted an investigation in accordance with federal wiretap law and intercepted a telephone call that would have been admissible in a federal court proceeding. The federal agents, however, did not follow the procedures demanded of state agents under New Jersey's wiretap law. Id. at 271, 276, 561 A.2d 570. The court noted that the failure of a state agent to comply with state law results in the exclusion of the evidence in a state prosecution. Id. at 278–79, 561 A.2d 570. Nevertheless, respecting the notion of federalism, the New Jersey Supreme Court held that since the state guidelines did not explicitly prohibit the use of independently obtained federal wiretap evidence, and the enforcement of the state guidelines to exclude the evidence would not further privacy interests, the evidence need not be excluded. Id. at 282, 561 A.2d 570.

In reaching its conclusion, the Minter court sought guidance from other jurisdictions that have resolved the "evolving problems of federalism attendant to differing state and federal views concerning the validity of searches." Id. at 279, 561 A.2d 570. The New Jersey court cited to the Minnesota Supreme Court, in State v. Lucas, 372 N.W.2d 731 (Minn. 1985), indicating that an exclusionary-rule analysis would serve both to deter unlawful conduct and to vindicate fundamental state guarantees. Thus, using that analysis, the court opined, "absent participation by State officers in the search, no principles or policies of the exclusionary rule would call for the categorical exclusion from state court proceedings of wiretap evidence that has been obtained by federal officers in accordance with federal law but not state wiretap requirements." Minter, 116 N.J. at 280, 561 A.2d 570. The court further reasoned that excluding wiretap evidence independently obtained by federal agents would not "deter unlawful conduct" because they lawfully obtained a federal wiretap under authorizing federal law. Id., 116 N.J. at 280–81, 561 A.2d 570. However, the case was ultimately remanded for determination of whether cooperation between state and federal officers was of such extent that the federal officers' failure to comply with the Act required exclusion of the wiretap evidence because it was obtained for the purpose of a state prosecution and, thus, unlawfully intercepted under New Jersey Wiretap Law.[39]

[39] In the matter at bar, Defendant did not allege or present any evidence of any collusion between the federal and state agents.  Thus, unlike the New Jersey court, we decline to remand the case for any further inquiry on that issue.

In the instant matter, we also reason that absent state guidelines to the contrary, exclusion from state court proceedings of wiretap evidence obtained lawfully by federal officers in accordance with the federal wiretap act would not promote the principles of the exclusionary rule.  Thus, respecting the notion of federalism, and the consideration that exclusion of the evidence would not further the privacy interests of the citizens of the State of Louisiana, we find the trial court properly determined the evidence need not be excluded.  Accordingly, the trial court did not abuse its discretion in denying Defendant's motion to suppress.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[46]

To the extent that Smith argues that the state courts misapplied state evidence law in finding the recordings admissible, his claim simply is not reviewable in this federal proceeding.  As the United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998).  For example, to the extent that Smith argues that the evidence was secured and introduced at trial in violation of the Louisiana's Electronic Surveillance Act, that argument is misplaced.  In rejecting a similar claim, United States Magistrate Judge Alma Chasez explained in an opinion subsequently adopted by United States District Chief Judge Nanette Jolivette Brown:

Although [petitioner] argues that the [law enforcement authorities] obtained the recordings in violation of Louisiana law and that the state court admitted the recordings in violation of a Louisiana statute, these matters are not cognizable on habeas review because they are matters of state law.  This court does not sit to review the state court's interpretation and application of its own laws.  See Swarthout v. Cooke, ––– U.S. –––, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (federal habeas review does not lie for errors of state law); Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); Gonzales v. Thaler, 643 F.3d 425, 429 (5th Cir. 2011); Jernigan v. Collins, 980 F.2d 292, 298 (5th Cir. 1992).  Moreover, the Supreme Court has "repeatedly held that a state court's

[46] Smith, 252 So. 3d at 482; Smith, 252 So. 3d at 482; State Rec., Vol. 17 of 17.

> interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005) (citing Estelle, 502 U.S. at 67-68; Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)). Therefore, to the extent that [petitioner] is arguing that the state courts merely misapplied state law with respect to this claim, his claim is not reviewable in this federal proceeding.

Favors v. Cain, Civ. Action No. 13-491, 2015 WL 349263, at *28 (E.D. La. Jan. 22, 2015); accord Green v. Cain, Civ. Action No. 14-2073, 2016 WL 6477038, at *4 (E.D. La. May 13, 2016) (Knowles, M.J.) (finding that petitioner's claim that the Louisiana Electronic Surveillance Act precluded admission of evidence was not cognizable on habeas review because the claim was "purely one of state law"), adopted, 2016 WL 6441232 (Nov. 11, 2016) (Milazzo, J.).

To the extent that Smith argues that interception of the communications violated *federal* law, his claim fares no better for the following reasons. If he is arguing that the actions of the agents ran afoul of the United States Constitution, his claim would fall under the Fourth Amendment. See Green, 2016 WL 6477038, at *3-4; Favors, 2015 WL 349263, at *29. However, as the state correctly notes in its response, this Court is barred from reviewing any such Fourth Amendment claim by Stone v. Powell, 428 U.S. 465 (1976).

In Stone, the United States Supreme Court held that where a state provides an opportunity for full and fair litigation of Fourth Amendment claims in the state courts, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence against him was obtained in an unconstitutional search and seizure. Id. at 494 (footnote omitted); see also Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002). Interpreting Stone, the United States Fifth Circuit Court of Appeals has held:

> An "opportunity for full and fair litigation" means just that: an opportunity. If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, Stone v. Powell bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978).  Therefore, the Stone bar applies even in those cases where no motion to suppress was ever filed.  Id. at 1192-93.  The Stone bar further applies even if the state court rulings on the Fourth Amendment claims were erroneous. Swicegood v. Alabama, 577 F.2d 1322, 1324 (5th Cir. 1978).

Stone clearly applies here.  As an initial matter, the Court notes that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims."  Bailey v. Cain, Civ. Action No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007).  Moreover, Smith in fact availed himself of that opportunity.  The state court record shows that defense counsel filed a motion to suppress, Smith's Fourth Amendment claims were fully litigated and denied after a hearing, and the claim was asserted, considered, and again denied on direct review.  Because Smith was afforded a full and fair opportunity to litigate his Fourth Amendment claim in state courts, Stone bars this Court from considering that claim.  Cardwell v. Taylor, 461 U.S. 571 (1983); Jones v. Johnson, 171 F.3d 270, 278 (5th Cir. 1999); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *18 (E.D. La. Dec. 11, 2008).

For all of these reasons, Smith has not established that his claim is cognizable on federal habeas corpus review or that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, this claim should be denied.

### C.    Denial of Mistrial

In his third claim, Smith contends that the trial court erred in denying a mistrial when improper contact was had between a juror and the prosecutor.  Specifically, he contends that, on the last day of trial, during the trial testimony of Special Agent Schliem, the prosecution published

a series of calls intercepted by the Nathan Curtis wiretap.[47]   The prosecutor was questioning Special Agent Schliem about each call in a sequential manner, and, after he finished questioning Schliem about one call and started questioning him about another one, one of the jurors interjected that the prosecution had missed a call.[48]   The trial court advised that the jury should not make comments.[49]   At a bench conference, Smith's counsel requested a mistrial or, in the alternative, an admonishment to the jury.[50]   The trial court noted that it had already advised the jury not to make any comments, found there were no grounds for a mistrial, and denied the motion.[51]

On appeal, the Louisiana Fifth Circuit Court of Appeal denied Smith's claim that the trial court erred in denying a mistrial, holding[52]:

### Denial of Mistrial

In his third assignment of error, Defendant argues the trial court erred in failing to grant a mistrial when improper communication was had between a juror and the prosecutor concerning the presentation of evidence.  Defendant further maintains that the failure of the trial court to admonish the jury after the State's communication with the juror, in lieu of a mistrial, was an additional error committed by the trial court and that the jury's verdict cannot be considered "unattributable" to this error.

On the final day of trial, during Special Agent Schliem's testimony, the State presented various wiretap recordings to the jury.  The wiretap recordings were admitted and transcripts of the recorded intercepts were published to the members of the jury.  While testifying regarding the phone calls, Special Agent Schliem brought to the State's attention that a juror was raising their hand.  The juror proceeded to advise the State that they had skipped one of the recordings that they had been provided within the transcribed packet of intercepts.  Specifically, the juror stated "you missed 876. You went to 890."  Immediately, the trial court admonished the jury not to make any comments during the trial.  The State noted that it would "go back to 876 in just one second."  Defendant then moved for a mistrial based on this interaction:

---

[47] State Rec. Vol. 11 of 17, trial transcript of November 6, 2015, at pp. 17, 26-29.
[48] Id., at p. 29.
[49] Id.
[50] Id., at p. 32.
[51] Id., at pp. 32-33.
[52] Smith, 227 So. 3d at 360-62; State Rec., Vol. 12 of 17.

DEFENSE: I've going to move for a mistrial and ask for a—If it's not granted, I'm going to ask for an admonishment to the Jury. The Jury has directly interacted with the State during the course of this trial, messing into evidence by the Jurors instructing the State as to which exhibits they are putting forward.

They're, obviously—no, she was obviously not going along as instructed and reading either ahead or behind, and I don't believe it's proper. I believe it's grounds for a mistrial that the Juror directly communicated with the State relative to the presentation of their evidence.

So I'm moving for a mistrial and, if not, at least, at minimum, admonishment.

THE COURT: Well, I've already told the Jury that they're not to interact, make any comments. I think what happened was they were handed out a stack of transcripts in order; in a particular order.

THE STATE: The transcript got stuck in my hand and I moved on to the next one not realizing that single-page transcript is a call I had skipped.

THE COURT: Yeah.

THE STATE: So I went and played the next call that showed up on the—

DEFENSE: And I caught that, as well, Your Honor. I just assumed Mr. Freese chose not to do that one.

THE COURT: I think, also, that's # 876 and you ought to put some brackets around that, so you won't—

DEFENSE: I just assumed Mr. Freese decided not to use that call. I don't have any control over his case, but—

THE STATE: No, it was—it was simply that, I think. You know, I think, I don't know, I'm assuming what I did was when I flipped from the one prior to that I turned that one over, as well.

DEFENSE: I just need to make my record, then.

THE COURT: Understood.

DEFENSE: Given the interaction between the State and one of the Jurors, I'm making my Motion for Mistrial, again, and the Court can rule any way it wishes.

THE COURT: The Court doesn't believe it's grounds for a mistrial. Your motion is denied and is noted for the record.

A mistrial is a drastic remedy and should be declared only when unnecessary prejudice results to the accused. State v. Alexander, 351 So.2d 505 (La. 1977); State v. Governor, 331 So.2d 443 (La. 1976). La. C.Cr.P. art. 775 provides, in pertinent part, that "[u]pon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770[40] or 771.[41]" (Internal footnotes added). It has been consistently held that when the conduct does not fall within the mandatory mistrial provisions of La. C.Cr.P. art. 770, the judge has the sound discretion to determine whether the activity or comment so prejudiced the defendant that he could not receive a fair trial. State v. Talbot, 408 So.2d 861, 866 (La. 1980).

[40] The challenged conduct does not fall within any of the mandatory mistrial provisions delineated under La. C.Cr.P. art. 770. Specifically, La. C.Cr.P. art. 770 provides:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

[41] La. C.Cr.P. art. 771 provides:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) *When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.*

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

(Emphasis added).  The present situation is covered by article 771(2).

A defendant's constitutional right to a fair trial by an impartial jury may be violated where jurors are subjected to influences which cause them to base their verdict on factors other than the evidence admitted at trial.  Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 549, 13 L.Ed.2d 424 (1965); State v. Bibb, 626 So.2d 913, 922 (La. App. 5th Cir. 1993), writ denied, 93-3127 (La. 9/16/94); 642 So.2d 1888.  Any unauthorized communication made by a non-juror to a juror (directly or indirectly) during trial about the matter pending before the jury is deemed presumptively prejudicial.  State v. Marchand, 362 So.2d 1090 (La. 1978); Bibb, supra; State v. Baker, 582 So.2d 1320 (La. App. 4th Cir. 1991), writ denied, 590 So.2d 1197 (La. 1992), cert. denied, 506 U.S. 818, 113 S.Ct. 62, 121 L.Ed.2d 30 (1992).  However, a new trial is warranted only upon a showing that a constitutional violation occurred and a reasonable possibility of prejudice exists.  State v. Day, 414 So.2d 349 (La. 1982); Bibb, supra; Baker, supra.

In State v. Chairs, 466 So.2d 647 (La. App. 5th Cir. 1985), the defendant argued on appeal that the trial court erred in denying his motion for a mistrial following the asking of a question by a juror.  During the trial, the defendant took the stand and on cross-examination by the prosecutor was asked to hold his hands as if he were holding a gun.  As the defendant was complying with the request, a juror asked the defendant if he was right handed, to which the defendant replied in the affirmative.  Thereafter, the defense moved for a mistrial based upon the exchange between the defendant and the juror.  In denying the mistrial, the trial court found the question was not elicited by the defense or the State and that the question and answer did not rise to the level of prejudice warranting a mistrial.  Thus, the trial court provided an admonition to the jury to disregard the question asked by the juror and the answer provided by the defendant.  This Court agreed, finding there was no prejudice resulting to the defendant and that the trial court properly denied the defense's motion for a mistrial.

In Chairs, a more egregious question was asked by a juror than the comment made by the juror in the instant matter advising the State of a missed recording that had previously been provided to the jurors in a transcribed packet.  Moreover, after the comment was made, the trial court admonished the juror not to interact or make any comments during the trial.  Thus, as in Chairs, supra, we find the comment made by the juror was neither elicited by the defense nor the State and that the comment did not rise to the level of prejudice warranting a mistrial.  Accordingly, we determine that the trial court properly denied Defendant's motion for a mistrial.

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[53]

---

[53] Smith, 252 So. 3d at 482; Smith, 252 So. 3d at 482; State Rec., Vol. 17 of 17.

To the extent that Smith claims that the state courts erred in failing to grant a mistrial under state law, such claims do not involve consideration of any questions of federal or constitutional law, and review of such claims is not proper on habeas review.  See Lavernia v. Lynaugh, 845 F.2d 493, 496 (5th Cir. 1988) (the failure to grant a mistrial is a matter of state law and not one of a constitutional dimension); Haygood v. Quarterman, 239 F. App'x 39, 42 (5th Cir. Jun.14, 2007) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right) (citing Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991)). Thus, even the misapplication of state law in denying the motion for mistrial would not entitle Smith to relief.  Thomas v. Ieyoub, 26 F.3d 1119, No. 93-3757, 1994 WL 286198, at *2 (5th Cir. June 22, 1994) (per curiam) (Table, Text in Westlaw) ("[E]rrors of state law, such as a denial of a mistrial, must rise to a constitutional dimension in order to merit habeas relief."); Smith v. Whitley, 18 F.3d 937, 93-03208, 1994 WL 83777, at *1 (5th Cir. Mar. 3, 1994) (Table, Text in Westlaw) ("Even if the court's refusal to declare a mistrial was a violation of Louisiana law, we, as a federal habeas court, are without authority to correct a simple misapplication of state law; we may intervene only to correct errors of constitutional significance.").  Any alleged impropriety based on state law does not warrant federal habeas review or relief.

A state court's denial of a motion for mistrial will trigger federal habeas corpus relief only if it was " 'error ... so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause.' "  Hernandez v. Dretke, 125 F. App'x 528, 529 (5th Cir. 2005) (quoting Bridge v. Lynaugh, 838 F.2d 770, 772 (5th Cir. 1988)).  In order to receive federal habeas relief, petitioner must show that "the trial court's error had a 'substantial and injurious effect or influence in determining the jury's verdict.' "  Hernandez, 125 F. App'x at 529 (citing Brecht v. Abrahamson, 507 U.S. 629, 623 (1993)).  Petitioner must show that "there is more than a mere reasonable

possibility that [the ruling] contributed to the verdict. It must have had a substantial effect or influence in determining the verdict." Woods v. Johnson, 75 F.3d 1017, 1026 (5th Cir. 1996).

The question of fundamental fairness at trial under the Due Process Clause presents a mixed question of law and fact. Wilkerson v. Cain, 233 F.3d 886, 890 (5th Cir. 2000); see Livingston v. Johnson, 107 F.3d 297, 309 (5th Cir. 1997) (whether evidence is admitted or excluded contrary to the Due Process Clause also is a mixed question of law and fact). The court must determine whether the denial of relief by the state courts was contrary to or an unreasonable application of federal law. In doing so, factual determinations made by the state court are presumed correct and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

On the record before this court, Smith has not established that the juror's comment to the prosecutor that he had skipped over one of the recorded calls was so prejudicial that it impacted the verdict. There was no substantive discussion between the prosecutor and the juror. The jury was immediately admonished that it should not make comments, and the juror apologized.[54] The call, which was later published to the jury, was part of an exhibit admitted into evidence and the prosecutor had permission to distribute transcripts of the calls to the jury.[55] Further, the trial testimony and evidence was presented over seven days through over forty witnesses. Smith simply has not shown that his trial was made unfair by a single juror's brief comment followed by the clear and direct admonition by the state trial court.

Smith has not shown that the trial court erred in failing to grant the motion for a mistrial. Nor has he shown any prejudice as a result of the juror's statement that the prosecution had missed one of the calls. Therefore, Smith has not shown that the state court's decision rejecting his claim

---

[54] Id., at p. 29.
[55] Id., at p. 17.

43

was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Relief is not warranted.

### D.    Excessive Sentence

Smith next claims that his enhanced sentence of 65 years as to count one is excessive. He claims that the sentence is disproportionate to the offense as well as to the sentence of his co-defendant. The state responds that this claim is procedurally barred from federal because Smith failed to exhaust his remedies in the state courts.

The Louisiana Fifth Circuit Court of Appeal on direct appeal found as follows[56]:

**Excessive Sentence**

In his final assignment of error, Defendant argues his original 50-year sentence and his enhanced 65–year sentence as a second felony offender on his conviction for racketeering (count one) is excessive. He compares his original 50-year sentence to that of co-defendant Williams, who received the same underlying sentence for racketeering, maintaining that the trial court failed to justify why the sentences were the same for himself and his co-defendant who was the leader of the Harvey Hustler gang. He maintains that his connection to racketeering and the crimes committed by the Harvey Hustler gang was tenuous at best and, accordingly, did not justify the trial court's imposition of the excessive 65-year enhanced sentence.

It is noted that Defendant's motion for appeal was filed on December 9, 2015, prior to the habitual offender proceedings held on December 17, 2015; and, although Defendant's motion for appeal was granted after the imposition of his enhanced sentence on December 17, 2015, his written motion for appeal specifically sought to appeal the guilty verdicts rendered on November 6, 2015, and the original sentences imposed on November 18, 2015. Thus, Defendant's 65-year habitual offender sentence on count one is not before this Court on appeal. Accordingly, only the excessiveness of Defendant's original sentence on count one has been addressed.[42]

[42] But see State v. Luckey, 16–494, 2017 La. App. LEXIS 171 (La. App. 5 Cir. 2/8/16), where this Court addressed the defendant's assignments of error concerning his convictions and conducted a full error patent review despite the defendant's "notice of appeal," which did not indicate that the defendant sought to appeal his convictions, having only referenced the date of his sentencing in his notice of appeal. In reaching this conclusion, this Court found that although the defendant did not explicitly seek review of his convictions in his notice of appeal, the defendant's sole assignments of error pertained only to his convictions, and "the Louisiana Supreme Court has recognized that appeals are favored in the law and has disapproved of the dismissal of appeals on

---

[56] Smith, 227 So. 3d at 362-63; State Rec., Vol. 12 of 17.

'hypertechnical' grounds" <u>Id.</u> (citing <u>State v. Armant</u>, 02-907 (La. App. 5 Cir. 1/28/03); 839 So.2d 271, 274, citing <u>State v. Bunnell</u>, 508 So.2d 55 (La. 1987)).

  Although distinguishable from <u>Luckey</u>, <u>supra</u>, which pertained to an appeal concerning the defendant's convictions and not to a separate habitual offender proceeding which occurred after the filing of the motion for appeal as in this case, it is nevertheless noted that under the facts of the instant matter, Defendant's enhanced sentence on count one is not excessive.  As a second felony offender, under La. R.S. 15:1354(A) and La. R.S. 15:529.1, Defendant was facing an enhanced sentencing range of 25 to 100 years imprisonment.  Accordingly, Defendant's enhanced 65–year sentence is 35 years below the maximum sentence that could have been imposed for a second felony offender with an underlying racketeering conviction.  It is further noted that Defendant's 65–year sentence is ten years less than the 75–year enhanced sentence imposed on co-defendant Williams, despite Defendant's complaint that he and co-defendant Williams received the same underlying sentence for racketeering.  While a 65–year sentence as a second felony offender with an underlying racketeering conviction has not been specifically addressed by the jurisprudence, the facts of this case and the jurisprudence cited with respect to Defendant's original sentence on count one support the enhanced sentence imposed.

  The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[57]

  "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  <u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004) (quotation marks omitted).  "To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts."  <u>Wilder v. Cockrell</u>, 274 F.3d 255, 259 (5th Cir. 2001) (quotation marks omitted).  Here, Smith did not file a motion to appeal after his habitual offender sentencing, and, as a result, the Louisiana Fifth Circuit found that the issue relating to his 65-year sentence was not before the court.  Therefore, necessarily, the claim is unexhausted.

  The United States Fifth Circuit Court of Appeals has further held that "when a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims

---

[57] <u>Smith</u>, 252 So. 3d at 481; <u>Smith</u>, 252 So. 3d at 482; State Rec., Vol. 17 of 17.

procedurally barred," then the claims are considered defaulted in federal court.  Nobles v. Johnson,

127 F.3d 409, 420 (5th Cir. 1997) (internal quotation marks omitted).

In the instant case, there is little doubt that any new attempt by Smith to exhaust this claim

would be rejected by the state courts on procedural grounds.  If he now tried to appeal his enhanced

sentence, the appeal would be rejected by a Louisiana state court as it is well beyond the time

limits set forth in the applicable procedural rules.  See La. Code Crim. P. Arts. 914 and 881.1.  If

he instead attempted to file a second state application for post-conviction relief reasserting his

claim of excessive sentence, that application would be denied as both repetitive under La. Code

Crim. P. art. 930.4[58] and untimely under La. Code Crim. P. art. 930.8.[59]  In fact, in denying Smith's

post-conviction writ application, the Louisiana Supreme Court already advised Smith that he is no

longer entitled to collateral review:

> Applicant has now fully litigated an application for post-conviction relief in
> state court.  Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-
> conviction procedure envisions the filing of a second or successive application only
> under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the
> limitations period as set out in La.C.Cr.P. art. 930.8.  Notably, the Legislature in
> 2013 La. Acts 251 amended that article to make the procedural bars against
> successive filings mandatory.  Applicant's claims have now been fully litigated in
> accord with La.C.Cr.P. art. 930.6, and this denial is final.  Hereafter, unless he can
> show that one of the narrow exceptions authorizing the filing of a successive
> application applies, relator has exhausted his right to state collateral review.[60]

---

[58] In pertinent part, that article provides:

> B. If the application alleges a claim of which the petitioner had knowledge and inexcusably failed
> to raise in the proceedings leading to conviction, the court shall deny relief.

....

> D. A successive application shall be dismissed if it fails to raise a new or different claim.

La. Code Crim. P. art. 930.4.

[59] Article 930.8 generally requires that a petitioner file his post-conviction within two years of the date on which his
conviction and sentence became final.  Although there are exceptions provided in the article, those exceptions to do
not appear to be applicable to Smith's claim that his enhanced sentence is excessive.

[60] Smith, 301 So. 3d at 1169; State Rec., Vol. 17 of 17.

As a result, Smith's unexhausted claim is procedurally barred from federal relief unless he demonstrates either that (1) both "cause" exists for his default and "prejudice" would result from the application of a procedural bar or (2) the Court's failure to address the claims would result in a "fundamental miscarriage of justice." See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-57 (5th Cir. 2004).

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted). Here, Smith has made no effort whatsoever to establish cause for his default, and, "[a]bsent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

Because Smith has not met the "cause and prejudice" test, his excessive sentence claim is barred from federal review unless the application of the procedural bar would result in a "fundamental miscarriage of justice." In order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." Finley v. Johnson, 243 F.3d 215, 220 (5th Cir. 2001) (citations omitted).

However, the United States Supreme Court has cautioned:

> To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be *exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence* – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup v. Delo, 513 U.S. 298, 324 (1995) (emphasis added). In this case, Smith has presented no new evidence of innocence, much less any new evidence of the type or caliber referenced in

<u>Schlup</u>.  Therefore, he has not established that any miscarriage of justice will result from the application of the procedural bar.

Accordingly, for all of these reasons, Smith's fourth claim asserting that his 65-year sentence is excessive is procedurally barred from federal review.

**E.    Ineffective Assistance of Trial Counsel**

Smith claims that he received ineffective assistance of his trial counsel when he failed to move for a severance from co-defendant Williams.  He claims that he was not affiliated with the crimes of Williams or the Harvey Hustlers.

The United States Supreme Court has established a two-prong test for evaluating such claims.  Specifically, a petitioner seeking relief on such a claim is required to show *both* that counsel's performance was deficient *and* that the deficient performance prejudiced his defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 697 (1984).  The petitioner bears the burden of proof and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." <u>Jernigan v. Collins</u>, 980 F.2d 292, 296 (5th Cir. 1993); <u>see also</u> <u>Clark v. Johnson</u>, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that the petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  <u>Strickland</u>, 466 U.S. at 697.

To prevail on the deficiency prong of the <u>Strickland</u> test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See <u>Styron v. Johnson</u>, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness." <u>Little v. Johnson</u>, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must consider the reasonableness of counsel's actions in light of all the circumstances.  See <u>Strickland</u>, 466 U.S. at 689.  "[I]t is necessary to

'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' " <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 371 (1993) (quoting <u>Strickland</u>, 466 U.S. at 690). The petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See <u>Crockett v. McCotter</u>, 796 F.2d 787, 791 (5th Cir. 1986); <u>Mattheson v. King</u>, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel. In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." <u>Crockett</u>, 796 F.2d at 793.

Smith raised his claim of ineffective assistance of counsel in his application for post-conviction relief. The state district court denied the claim as follows[61]:

> Petitioner claims that counsel was ineffective at trial in failing to move for a severance from co-defendant Robert Williams. The court finds that these claims are classic examples of counsel's strategic choices. Such decisions are entitled to deference by the reviewing court. Trial strategy is not deficient unless it is outside of the wide range of professionally competent assistance. <u>Strickland</u>, 466 U.S. at 689-690.
>
> As the State surmises in its response, trial counsel, did indeed, move for severance on at least two occasions. Because a motion for severance filed on behalf of one defendant is presumed to be filed on behalf of all defendants unless contrary is asserted, there is no need for defendant's trial counsel to file a separate motion. <u>State v. Webb</u>, 424 So. 3d 233 (La. 1982). The Louisiana Fifth Circuit Court of Appeal has already concluded that a joint trial was necessary in this particular case. <u>State v. Williams</u>, 16-417 (La. App. 5 Cir. 8/30/17), 227 So. 3d 371, 393. Thus,

---

[61] State Rec., Vol. 4 of 17, Order on Post-Conviction Application of December 2, 2019.

petitioner does not prove deficiency of counsel's performance, or any prejudice resulting.

The Louisiana Fifth Circuit denied Smith's claim finding as follows[62]:

A criminal defendant has a constitutional right to effective assistance of counsel. State v. Johnson, 08-1156, p. 13 (La. App. 5 Cir. 4/28/09), 9 So.3d 1084, 1092, writ denied, 09-1394 (La. 2/26/10), 28 So.3d 268.  To prove ineffective assistance of counsel, a defendant must prove both that his attorney's performance was deficient and that he was prejudiced by the deficiency.  Id. at 109-93 (citing Strickland v Washington 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed 2d 674 (1984); State v. Soler, 93-1042 (La. App. 5 Cir. 4/26/94), 636 So.2d 1069, 1075, writs denied, 94-0475 (La. 4/4/94) 637 So.2d 450 and 94-1361 (La. 11/4/94), 644 So.2d 1055). In order to show prejudice, a defendant must demonstrate that but for counsel's unprofessional conduct, the outcome of the proceeding would have been different. Johnson, 08-1156 at 13, 9 So.3d at 1093 (citing Strickland, 466 U.S. at 693, 104 S. Ct. at 2068; Soler, supra).

As the trial court stated, during the course of pre-trial and trial proceedings, counsel for co-defendant Robert Williams moved for severance on at least two occasions.  An objection made by one defendant in a multi-defendant trial is presumed to have been made on behalf of all defendants.  State v. Webb, 424 So.2d 233, 236 (La. 1982).  This court also already determined that the trial court's denial of the motions to sever was not in error, that each defendant's defense was not antagonistic...and a joint trial was warranted in this prosecution.  State v. Williams, 16-417 (La. App. 5 Cir. 8/30/17), 227 So.2d 371, writ denied, 2017-1663 (La. 9/14/18), 252 So. 3d 483.  Accordingly, defendant has failed to show that counsel's performance at trial was ineffective and that but for this conduct, the outcome of his trial would have been different.

The Louisiana Supreme Court denied Smith's writ application finding he did not meet the

Strickland standard.[63]

Because Smith's ineffective assistance of counsel claims were denied on the merits, and

because such claims present mixed questions of law and fact, Smith is entitled to federal habeas

relief on the claims only if he shows that the state court decision was "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir.

---

[62] State Rec., Vol. 16 of 17, La. 5th Cir. Order, 20-KH-36, dated March 2, 2020.
[63] Smith, 301 So.3d at 1169; State Rec., Vol. 17 of 17.

2002).  Further, the United States Supreme Court has explained that, under the AEDPA, federal

habeas corpus review of ineffective assistance of counsel claims is in *fact doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u>
> standard was unreasonable.  This is different from asking whether defense
> counsel's performance fell below <u>Strickland</u>'s standard.  Were that the inquiry, the
> analysis would be no different than if, for example, this Court were adjudicating a
> <u>Strickland</u> claim on direct review of a criminal conviction in a United States district
> court.  Under AEDPA, though, it is a necessary premise that the two questions are
> different.  For purposes of § 2254(d)(1), an unreasonable application of federal law
> is different from an incorrect application of federal law.  A state court must be
> granted a deference and latitude that are not in operation when the case involves
> review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief
> so long as fairminded jurists could disagree on the correctness of the state court's
> decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d
> 938 (2004).  And as this Court has explained, "[E]valuating whether a rule
> application was unreasonable requires considering the rule's specificity.  The more
> general the rule, the more leeway courts have in reaching outcomes in case-by-case
> determinations."  <u>Ibid.</u>  "[I]t is not an unreasonable application of clearly
> established Federal law for a state court to decline to apply a specific legal rule that
> has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S.
> ——, ——, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation
> marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then

explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An ineffective-assistance
> claim can function as a way to escape rules of waiver and forfeiture and raise issues
> not presented at trial, and so the <u>Strickland</u> standard must be applied with
> scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very
> adversary process the right to counsel is meant to serve.  Even under *de novo*
> review, the standard for judging counsel's representation is a most deferential one.
> Unlike a later reviewing court, the attorney observed the relevant proceedings,
> knew of materials outside the record, and interacted with the client, with opposing
> counsel, and with the judge.  It is all too tempting to second-guess counsel's
> assistance after conviction or adverse sentence.  The question is whether an
> attorney's representation amounted to incompetence under prevailing professional
> norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under §
> 2254(d) is all the more difficult.  *The standards created by <u>Strickland</u> and § 2254(d)*

> *are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.   Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (emphasis added; citations omitted).  Therefore, on habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to Smith's ineffective assistance of counsel claim.

Pursuant to La. Code Crim. P. art. 704, jointly indicted defendants shall be tried jointly, unless the state elects to try them separately or on motion of a defendant and after a contradictory hearing the trial court satisfies itself that justice requires severance.  To establish that justice requires a severance in Louisiana, a defendant must show by convincing evidence that his defense will be antagonistic to the defense offered by the other defendant.  <u>State v. Crowell</u>, 773 So. 2d 871, 877 (La. App. 4th Cir. 2000) (citation omitted).  A severance is required under the antagonistic defense test when each defendant blames the other, which then would require the each defendant to defend against his co-defendant as well as the state.  <u>Id.</u> (citation omitted). "Justice does not require severance where only the extent of participation of each defendant is at issue." <u>State v. Gaskin</u>, 412 So.2d 1007, 1012–13 (La. 1982).

Initially, while counsel for Smith did not move for a severance pretrial, he did so on the second day of trial testimony.[64]  Thus, Smith's claim that his trial counsel failed to move for a severance is factually baseless.

After a series of questions by co-defendant William's counsel to Special Agent Schliem in an attempt to demonstrate that Williams was not recorded on any of the intercepted phone calls, Smith's trial counsel argued that it was clear from co-defendant Williams' counsel's questions that the defense had become antagonistic.[65]  Williams' counsel joined in the request, advising, "I think that there may be other times when I may have to say some things or ask questions that may cast a negative light on Mr. Smith."[66]  The trial court denied the motion finding that nothing had yet to be presented "that would cast any negative issues" on Smith.[67]

Smith did not raise the denial of his motion to sever on direct appeal.  However, significantly, on direct appeal of co-defendant Williams, the Louisiana Fifth Circuit Court of Appeal found that a joint trial of Williams and Smith was necessary and that the defendants' defenses *were not antagonistic*.  State v Williams, 227 So. 3d 371 (La. 5th Cir. 2017).  The court explained:

> Whether justice requires a severance must be determined by the facts of each case.  State v. Prudholm, 446 So.2d 729, 741 (La. 1984); State v. Foret, 96-281 (La. App. 5 Cir. 11/14/96); 685 So.2d 210, 224.  A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court.  State v. Cedrington, 98-253 (La. App. 5 Cir. 12/16/98); 725 So.2d 565, 577, writ denied, 99-0190 (La. 6/4/99); 743 So.2d 1249.  A denial of a motion to sever will not be overturned absent a clear abuse of discretion. Prudholm, 446 So.2d at 741.
>
> A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing

---

[64] State Rec., Vol. 7 of 17, trial transcript of October 30, 2015, at pp. 110-11; State Rec., Vol. 2 of 17, trial minutes of October 30, 2015.
[65] Id.
[66] Id., at p. 111.
[67] Id.

each defendant to defend against both his co-defendant and the State. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577. The defendant bears the burden of proof in a motion to sever. State v. Jackson, 03-883 (La. App. 5 Cir. 4/27/04); 880 So.2d 841, 851–52, writ denied, 04-1399 (La. 11/8/04); 885 So.2d 1118.[42] The mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. State v. Coe, 09-1012 (La. App. 5 Cir. 5/11/10); 40 So.3d 293, 301–02, writ denied, 10-1245 (La. 12/17/10); 51 So.3d 17. For defendants to be entitled to separate trials, prejudice must be shown. Jackson, 880 So.2d at 852. Antagonistic defenses are not the only instances where the denial of a motion to sever will constitute an abuse of discretion. Where the ends of justice will be best served by severance, it should be granted. Cedrington, 725 So.2d at 577–78 (citing State v. Webb, 424 So.2d 233 (La. 1982)).

Prejudice may occur in a joint trial "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (citing Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)).

In Zafiro v. United States, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the Supreme Court commented that joint trials play an important role in the criminal justice system, as they promote efficiency and serve the interest of justice by avoiding the inequity of inconsistent verdicts. The Zafiro Court found that severance is not mandated whenever co-defendants have conflicting defenses, even if a defendant is prejudiced by the joinder. It is up to the district court's discretion to tailor the relief, if any, to be granted to the prejudiced party.

The Zafiro Court commented that when defendants have been properly joined, a district court should grant a severance only when a specific trial right of one of the defendants might be compromised, or where there is a risk that the jury will arrive at an unreliable verdict. "Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." Zafiro, 506 U.S. at 534, 113 S.Ct. at 935; see also State v. Johnson, 96-0959 (La. 6/28/96); 675 So.2d 1098. At trial in the present case, there was no reference to conflicting interests between Defendant and his co-defendant Smith nor were their defenses antagonistic to one another. Neither Defendant nor co-defendant blamed one another for the respective crimes for which they were charged. In fact, based on the testimony established at trial, they possessed such separate and distinct roles in the alleged drug trafficking enterprise that neither Defendant nor co-defendant could shift the blame from one to the other. The mere allegation of conflicting interests between co-defendants does not constitute mutually antagonistic defenses requiring severance. State v. Lewis, 11-1000 (La. App. 5 Cir. 5/22/12); 96 So.3d 1211, writ denied, 12-1480 (La. 11/21/12); 102 So.3d 55. Moreover, Defendant has not shown how he was prejudiced by the lack of a severance. In Foret, 685 So.2d at 224, this Court found that "justice does not require severance where only the extent of

participation of each defendant is at issue." Thus, the fact that Defendant did not participate in the murder of Donte Hall, a charge for which only his co-defendant was indicted, was not a consideration for the trial court in determining whether a severance was required.

Also, Defendant and co-defendant were charged in a 30–count indictment for various crimes stemming from a criminal drug enterprise amongst numerous co-conspirators in Jefferson Parish. At trial, over 40 witnesses testified regarding the charged offenses. The numerous witnesses and overlapping nature of the charges surrounding the wrongdoings by the criminal enterprise in this case necessitated the joint trial of Defendant and his co-defendant, so as to present a cohesive narrative for the jury. Piecemeal litigation is not sanctioned by the courts and, where the same witnesses would be called to testify, judicial economy dictates that there be one trial. Warren v. Bergeron, 599 So.2d 369 (La App. 3 Cir. 1992), cert. denied, 604 So.2d 995 (La. 1992). Accordingly, we find the trial court did not abuse its discretion in denying Defendant's motion to sever.

Id., at 395 (footnote omitted).

In addressing Williams' counsel's cross-examination of Special Agent Schliem, which Smith's counsel claimed showed that the co-defendants had antagonistic defenses, the Louisiana Fifth Circuit specifically noted:

Despite allegations to the contrary, a reading of Defendant's cross-examination of Special Agent Schliem does *not establish antagonistic defenses* among Defendant and co-defendant; rather, as the trial court stated, it merely sets forth the facts brought out by the State on direct examination regarding the intercepted telephone calls involving codefendant Smith.

Williams, 227 So. 3d at 394 n. 41 (emphasis added).

As noted, Smith's counsel in fact moved for a severance of trials. The fact that the motion was unsuccessful does not render counsel ineffective. See Martinez v. Dretke, 99 F. App'x 538, 543 (5th Cir. 2004) ("Again, an unsuccessful strategy does not necessarily indicate constitutionally deficient counsel."); Baker v. United States, No. 07cr435, 2011 WL 3841690, at *13 (E.D. Va. Aug. 30, 2011) ("... the record shows [counsel] effectively advocated on Petitioner's behalf by making a timely, reasonable objection ... [t]hus, counsel's actions were effective notwithstanding their lack of success...."), aff'd, 477 F. App'x 144 (4th Cir. 2012). Further, given the Louisiana's

Fifth Circuit decision finding that the defenses were not antagonistic and a joint trial was necessary, Smith has not shown any prejudice with regard to his counsel's performance as to the motion to sever.

Smith fails to show that the state court's denial of relief on these issues was contrary to or an unreasonable application of <u>Strickland</u>.  He is not entitled to relief on this claim.

### F.    Nonunanimous Verdict

In his final claim, Smith contends that Louisiana's nonunanimous jury scheme is unconstitutional.  The state argues that Smith's claim is unexhausted and technically procedurally barred.

Smith raised his nonunanimous jury verdict claim in his application for post-conviction relief.  The state district court found that claim procedurally barred pursuant to La. Code Crim. P. art. 930.4(c) for failure to raise the claim on direct appeal.[68]  The Louisiana Fifth Circuit Court of Appeal similarly found that the claim was procedurally barred under La. Code Crim. P. 930.4.[69] Notably, contrary to the state's argument, the Louisiana Supreme Court did *not* adopt that finding but rather specifically found that "applicant fails to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2" as to the claim.[70]

Article 930.2 provides that "[t]he petitioner in an application for post conviction relief shall have the burden of proving that relief should be granted."  Courts have found that the Louisiana Supreme Court's citation to La. Code Crim. P. art. 930.2 that does not also include a citation to any other grounds is a decision on the merits and does *not* constitute a state procedural bar.  <u>Darby</u>

---

[68] State Rec., Vol. 4 of 12, Order on Post-Conviction Application of December 2, 2019.
[69] State Rec., Vol. 16 of 17, La. 5th Cir. Order, 20-KH-36, dated March 2, 2020.
[70] <u>Smith</u>, 301 So. 3d at 1169; State Rec., Vol. 17 of 17.

v. Vannoy, No. 19-13900, 2020 WL 5468953, at *7 (E.D. La. Aug. 14, 2020) (collecting cases), adopted, 2020 WL 5436571, at *1 (E.D. La. Sep. 10, 2020).

In this case, the Louisiana Supreme Court only cited to La. Code Crim. P. art. 930.2. As a result, the Court rejects the state's position that this claim is unexhausted and procedurally barred, and will address the merits of the claim.

Smith was convicted as charged in counts one, two and nineteen. It is unclear from the record whether all three of the jury verdicts as to Smith were nonunanimous.[71]

Smith's challenge to the constitutionality of his verdicts and Louisiana law on nonunanimous jury verdicts presents a pure question of law. Ortiz v. Quarterman, 504 F.3d 492, 496 (5th Cir. 2007). Thus, Smith may obtain federal habeas corpus relief only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent.

The AEDPA deferential standard requires this Court to apply law that was clearly established "at the time the conviction becomes final." Peterson v. Cain, 302 F.3d 508, 511 (5th Cir. 2002) (citing Williams v. Taylor, 529 U.S. 364, 380-81 2000)). As calculated, Smith's conviction was final on December 14, 2018, when he did not file an application for writ of certiorari with the United States Supreme Court within 90 days after the Louisiana Supreme Court denied his post-appeal writ application on September 14, 2018. At that time, the clearly established United States Supreme Court precedent applicable to Smith's claim was directly contrary to his argument.

In Apodaca v. Oregon, 406 U.S. 404 (1972), and Johnson v. Louisiana, 406 U.S. 356 (1972), the United States Supreme Court upheld the constitutionality of state laws, including Louisiana's

---

[71] State Rec., Vol. 11 of 17, trial transcript of November 6, 2015, at pp. 120-21.

law, that permitted criminal defendants to be convicted by less than unanimous jury votes. While the Supreme Court itself has described the Apodaca/Johnson holding as "the result of an unusual division among the Justices," it also made clear at that time that "although the Sixth Amendment right to trial by jury requires a unanimous verdict in federal criminal trials, it does not require a unanimous verdict in state criminal trials." McDonald v. City of Chicago, 561 U.S. 742, 765 n.14 (2010) (citing Apodaca, 406 U.S. at 404 and Johnson, 406 U.S. at 356).

In the habeas corpus context, the United States Fifth Circuit Court of Appeals previously recognized that a prisoner's constitutional challenge to a state court conviction by a nonunanimous jury must be rejected under Apodaca/Johnson "because the Supreme Court 'has not held that the Constitution imposes a jury unanimity requirement.' " Hoover v. Johnson, 193 F.3d 366, 369 (5th Cir. 1999) (quoting Richardson v. United States, 526 U.S. 813, 821 (1999) and citing Johnson, 406 U.S. at 366). Thus, at the time of Smith's conviction, the use of the nonunanimous verdict rule by the Louisiana court was not contrary or an unreasonable application of clearly established Supreme Court precedent existing at the time.

The Court recognizes the United States Supreme Court issued Ramos v. Louisiana, 140 S. Ct. 1390, 1407 (2020), finding that unanimity in jury verdicts is required under Sixth Amendment. However, on May 17, 2021, the Supreme Court also held in Edwards v. Vannoy, 141 S. Ct. 1547 (2021), that "Ramos announced a new rule of criminal procedure" that "does not apply retroactively on federal collateral review." Id. at 1562. The Ramos decision, therefore, did not alter the application of the Supreme Court precedent existing at the time of Smith's conviction under AEDPA review. See United States v. Lopez-Velasquez, 526 F.3d 804, 808 n.1 (5th Cir. 2008) ("Absent an intervening Supreme Court case overruling prior precedent, we remain bound to follow our precedent even when the Supreme Court grants certiorari on an issue.") (citing United

States v. Short, 181 F.3d 620, 624 (5th Cir. 1999), and Ellis v. Collins, 956 F.2d 76, 79 (5th Cir. 1992)).

In 2018, Louisiana voters approved an amendment to Article I, Section 17(A) of the Louisiana Constitution, to require unanimous jury verdicts in cases like this one. The state constitutional amendment, however, is expressly limited to offenses "committed on or after January 1, 2019." Accordingly, it does not apply retroactively to Smith's November 6, 2015 conviction.

For the foregoing reasons, based upon the law as it was at the time of his conviction and now, the state court's denial of relief was not contrary to or an unreasonable application of Supreme Court law. Smith is not entitled to federal habeas corpus relief on this claim.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Alcus Smith be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this  13th  day of May, 2022.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**